Filed 12/8/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| STEPHEN DREHER et al., | B329610 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 19STCV07272) |
| v. | |
| CITY OF LOS ANGELES DEPARTMENT OF WATER AND POWER, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mary H. Strobel, Judge. Affirmed.

Berding & Weil, Daniel Rottinghaus, Anne L. Rauch, Fredrick Hagen, Trinette Sachrison; Law Office of Paul G. Kerkorian and Paul G. Kerkorian for Plaintiffs and Appellants.

Bird, Marella, Rhow, Lincenberg, Drooks & Nessim, Thomas R. Freeman; Glancy Prongay & Murray, Jonathan M. Rotter, and Natalie S. Pang for Andrew Mollner, John McNeil, Jr., Rosalinda Rodriguez, and Aubrey Ford as Amici Curiae on behalf of Plaintiffs and Appellants.

Jonathan M. Coupal, Timothy A. Bittle, Laura E. Dougherty, and Amy C. Sparrow for Howard Jarvis Taxpayers Foundation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Colantuono, Highsmith & Whatley, Holly O. Whatley, and Liliane M. Wyckoff for Defendant and Respondent.

——————————————————

In March 2016, the Council of the City of Los Angeles passed an ordinance approving water rates to be charged to customers of the Los Angeles Department of Water and Power (LADWP), a department of the City of Los Angeles (City). In 2019, Stephen and Melinda Dreher (the Drehers), LADWP customers, filed a complaint for damages and a petition for writ of mandate against the City, challenging the rates they paid for water service under article XIII D, section 6, subdivision (b) of the California Constitution,[1] which limits a local agency's power to impose and increase property related fees and charges. On behalf of themselves and all other similarly situated LADWP customers, the Drehers asserted (1) that a low income subsidy the City embedded in the water rates of customers who did not qualify for the subsidy was unconstitutional, and (2) that the City's tiered water rates, which increase progressively in relation to level of water usage, "exceed the proportional cost of the service attributable to the parcel," within the meaning of article XIII D, section 6, subdivision (b)(3). The Drehers prevailed on their challenge to the low income subsidy charge, and the trial

_____

[1] Undesignated article references are to the California Constitution.

court issued a peremptory writ of mandate requiring the City to stop including the charge in its water rates. The court denied the Drehers' claim for a refund of the charges they paid prior to entry of judgment, concluding their refund claim was barred because they did not pay the charges under protest pursuant to Health and Safety Code section 5472. The court found the City's tiered water rates otherwise complied with the California Constitution.

On appeal, the Drehers contend the payment under protest requirement in Health and Safety Code section 5472 does not apply to the water charges at issue. Based on the plain language of the statutory scheme, we disagree. The Drehers also contend the City did not meet its burden at trial to demonstrate that its tiered water rates comply with the California Constitution, arguing that the City failed to determine the actual costs of providing water at each tiered level of usage. Again, we disagree.

We reject the Drehers' attempt to foist onto the City a more stringent standard than the Constitution imposes. The City was required to prove that the rates it charged were proportional to the cost of service attributable to the parcel. It was not required to meet the Drehers' proposed standard of proving it determined the exact water supply costs for each individual parcel by, among other things, tracing each of its four separate sources of water from its genesis to the parcel where it was used. The administrative record contains the City's cost data as well as the formulas for calculating costs of providing water service in each tier based on that data. Exercising our independent judgment, we conclude the evidence in the record is sufficient to show the City met its burden. We affirm the judgment.

3

## BACKGROUND

Under the City's Charter, LADWP, through its Board of Water and Power Commissioners (Board), has the power and duty to set proposed water rates for LADWP users. (L.A. Charter, §§ 670, 675(b)(3).) LADWP's proposed water rates are subject to approval by ordinance of the City Council. (*Id*. at § 676.)

Before we discuss the particulars of the ratemaking process for the challenged water rates, we provide background on some legal authorities that informed the ratemaking process.

## A.    Article XIII D Added by Proposition 218

In 1996, California voters adopted Proposition 218, the "Right to Vote on Taxes Act," which added articles XIII C and XIII D to the California Constitution. Article XIII D, at issue here, applies to assessments, defined as "any levy or charge upon real property by an agency for a special benefit conferred upon the real property," and to fees and charges, defined as "any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." (Art. XIII D, §§ 1, 2, subds. (b) & (e).)[2]

_____

[2] Article XIII C "restricts the authority of local governments to impose taxes by, among other things, requiring voter approval of all taxes imposed by local governments." (*City of San Buenaventura v. United Water Conservation Dist.* (2017) 3 Cal.5th 1191, 1200.) "Article XIII C buttresses article XIII D by limiting the other methods by which local governments can exact revenue using fees and taxes not based on real property value or

"[D]omestic water delivery through a pipeline is a property-related service within the meaning of" article XIII D.  (*Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 217.)  "[O]nce a property owner or resident has paid the connection charges and has become a customer of a public water agency, all charges for water delivery incurred thereafter are charges for a property-related service, whether the charge is calculated on the basis of consumption or is imposed as a fixed monthly fee."  (*Ibid.*)

Section 6 of article XIII D includes procedural requirements (in subdivision (a)) and substantive requirements (in subdivision (b)) for imposition and increase of property-related fees and charges.  The Drehers do not dispute the City complied with section 6's procedural requirements when it imposed the water rates they challenge.  In their complaint, as explained more fully below, they alleged the City failed to comply with several of section 6's substantive requirements.  The substantive requirement primarily at issue in this appeal is section 6, subdivision (b)(3), which provides, "The amount of a fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel."  Section 6, subdivision (b)(1), which also informs our analysis of the constitutionality of the City's water rates, provides:  "Revenues derived from the fee or charge shall not exceed the funds required to provide the property related service."  "These two conditions work together to ensure the agency collects only enough to cover its costs, and within that

_____

ownership."  (*Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 10.)

5

overall cost structure, only charges each customer his or her 'fair share' on a proportional basis." (*Morgan v. Imperial Irrigation Dist.* (2014) 223 Cal.App.4th 892, 908 (*Morgan*).)

As stated in section 6, subdivision (b)(5), "[i]n any legal action contesting the validity of a fee or charge," the agency bears the burden "to demonstrate compliance" with article XIII D.

## B.     The *Capistrano* Decision

In April 2015, while LADWP was in the process of preparing a rate study regarding the tiered water rates at issue here, the Fourth District, Division 3 decided *Capistrano Taxpayers Association v. City of San Juan Capistrano* (2015) 235 Cal.App.4th 1493 (*Capistrano*). At that time, "over half" of the members of the Association of California Water Agencies had "some sort of tiered water rate system," meaning "inclined rates that go up progressively in relation to usage." (*Id.* at pp. 1499, fn. 6 & 1497.)

In *Capistrano*, the plaintiff challenged, in pertinent part, the city water department's tiered water rates under Proposition 218, and specifically article XIII D, section 6, subdivision (b)(3). (*Capistrano*, *supra*, 235 Cal.App.4th at pp. 1497, 1501.) Applying the "independent review standard" applicable when reviewing challenges to agency actions under Proposition 218, the Court of Appeal agreed with the trial court's conclusions that "Proposition 218 requires public water agencies to calculate the actual costs of providing water at various levels of usage," and the city did not meet its burden of demonstrating compliance, as the record showed it "did not try" to do so. (*Id.* at pp. 1497-1498, 1507.) For example, the city obtained water from five separate sources, but the appellate record only contained information regarding the

cost of obtaining water from one of the sources.  (*Id*. at p. 1500.) Instead of attempting to calculate actual costs, the city "balance[d] its total costs of service with its total revenues," and "dr[e]w lines based on water [usage] budgets" it created, in order to allocate costs among the tiers.  (*Id*. at pp. 1506, 1511.)  The city did not "correlate its tiered prices with the actual cost of providing water at those tiered levels," as the *Capistrano* court concluded was required to demonstrate the tiered rates did "not exceed the proportional cost of the service attributable to the parcel" within the meaning of article XIII D, section 6, subdivision (b)(3).  (*Id*. at p. 1506.)

The *Capistrano* court highlighted some principles, with which we agree, that are pertinent to our analysis here.  First, tiered water rates "are perfectly consonant with article XIII D, section 6, subdivision (b)(3)," if they "correspond to the actual cost of providing service at a given level of usage." (*Capistrano*, *supra*, 235 Cal.App.4th at pp. 1497-1498.)  In other words, Proposition 218 does not prohibit tiered water rates that comply with its provisions.  Second, an agency may consider its water conservation goals in setting its water rates, so long as it also complies with Proposition 218.  (*Id*. at pp. 1508-1511, citing *City of Palmdale v. Palmdale Water Dist*. (2011) 198 Cal.App.4th 926, 936-937.)  And third, "[T]here is nothing at all in [article XIII D, section 6,] subdivision (b)(3) or elsewhere in Proposition 218 that prevents water agencies from passing on the incrementally higher costs of expensive water to incrementally higher users.[3]

_____

[3] As we explain below, the water LADWP delivers to its customers comes from several different sources.  LADWP's costs to obtain water vary by source.

7

That would seem like a good idea. But subdivision (b)(3) does require they figure out the true cost of water, not simply draw lines based on water budgets." (*Capistrano*, at pp. 1510-1511.)

The administrative record of the City's ratemaking action shows that LADWP took *Capistrano* into consideration as it finalized its rate study at the end of 2015.

## C.     The City's Ratemaking Process

In 2014-2015, LADWP conducted a "Water Service Cost of Service Study" (COSS) and prepared a "Water System Rate Action Report" (rate study) regarding its Schedule A (single-dwelling unit) residential customers as well as other types of customers. LADWP determined it needed to raise its water rates to meet its rising financial obligations (e.g., to comply with federal and state water quality regulations, to replace water system infrastructure, and to fund projects to increase its local water supply). The Drehers challenge only the Schedule A water rates.

### 1.     *LADWP's water system*

At the time of this ratemaking action, LADWP supplied water to "nearly four million citizens of Los Angeles." As explained in the rate study, "LADWP delivers water to its customers through a complex and expansive network. Raw water is conveyed to treatment plants through 300 miles of aqueduct tunnels. After treatment, water is stored in 9 reservoirs and 114 storage tanks across the system until it is needed. The water is delivered to customers through a network of large and small pipes, with varied functions, measuring more than 7,200 miles in length. Trunk lines are pipes with a diameter greater than 20 inches that transport water from wells and aqueducts to

reservoirs and enable the movement of water from one area of the City to another. Trunk lines connect to smaller pipes known as distribution mains that supply water to the customer's service connection. Consumption of the delivered water is measured by 700,000 water meters that provide the basis for determining a customer's water bill. In addition, there are 2,668 valves, 94 pump stations and 327 pressure regulator and relief stations throughout the system, which together maintain the flow of water."

The four sources of LADWP's water supply are the Los Angeles (LA) Aqueduct, groundwater, recycled water, and water purchased from the Metropolitan Water District (MWD). Water from these sources is treated and mixed together before it is distributed to residential customers.

### 2. *Water supply costs*

As part of the COSS and the rate study, LADWP determined its current costs and projected costs over five years to obtain water from each of the four supply sources used by its customers, including Schedule A customers. LADWP determined the unit price of each source of supply per hundred cubic feet (HCF) by dividing the estimated expense of the supply for the relevant 12-month period by the number of production units of the supply measured in acre-feet, and then dividing the result by 435.6 to convert to HCF (one HCF equals 748 gallons, and one acre-foot equals 43,560 cubic feet of water). At the conclusion of its study, LADWP found that the sources of supply from most to least expensive per unit were: (1) recycled water, (2) MWD water, (3) groundwater, and (4) water from the LA Aqueduct. LADWP determined how much the percentage of water supplied from

each source would change over a five-year period from fiscal year 2015-2016 through fiscal year 2019-2020.

### 3. *Water rate design*

LADWP designed a new rate structure for Schedule A customers, consisting of four tiers.[4] The water rate increases incrementally as the customer uses more water and moves out of a lower tier into a higher tier.

In designing its new rates, LADWP considered Proposition 218's requirements and *Capistrano*'s conclusions regarding compliance with those requirements. LADWP also took into account the City's water conservation goals, specifically the "Mayor's Executive Directive 5 . . . to reduce Los Angeles water consumption by 20% on a per capita basis by the end of 2017" due to drought conditions. LADWP explained in its rate study that "a primary objective" of its "rate structure and rates is to provide price signals that continue to encourage customers to conserve."

#### a. *Tiered water allotments*

Under the new rate structure, each Schedule A parcel (parcel) is allotted 8 HCF of water per month in Tier 1 to account for indoor, basic water needs.[5] Tier 2 and Tier 3 allotments,

---

[4] Our discussion of tiers throughout this opinion refers to Schedule A tiers, unless otherwise specified. The LADWP rate structure includes other schedules which also contain tiers, and the rate structure spreads some costs across several schedules (and across tiers within the schedules). Because the Drehers only challenge Schedule A tiered rates, we only discuss the rates in relation to Schedule A, despite the fact that water costs are spread across other schedules (and tiers).

[5] Under the former two-tier rate structure for Schedule A, the City used family size as one of the factors for setting the

which are designed to account for outdoor water use, vary based on the parcel's lot size, the season, and the parcel's temperature zone.  Parcels are divided into five groups based on lot size: (1) up to 7,499 square feet; (2) from 7,500 to 10,999 square feet; (3) from 11,000 to 17,499 square feet; (4) from 17,500 to 43,559 square feet; and (5) over 43,559 square feet.  Each lot size group is allotted a uniform winter season (Oct. 1-May 31) water budget in Tier 2, and another in Tier 3.  During the summer season (June 1-Sept. 30), the Tier 2 and Tier 3 water allotments within each lot size group vary depending upon whether a parcel is located in a low, medium or high temperature zone (determined by zip code).  LADWP set the water allotments for Tiers 2 and 3 by applying Evapotranspiration Adjustment Factors (ETAF) developed by the California Department of Water Resources, which determine the amount of water needed for landscape irrigation based on factors including plant type and irrigation efficiency.  To set the Tier 2 water allotments, LADWP used an ETAF of 45 percent, which represents the most efficient, drought tolerant landscaping.  To set the Tier 3 water allotments, LADWP used an ETAF of 135 percent, which represents less efficient irrigation and non-drought tolerant landscaping.  Tier 4 applies to all water usage above the Tier 3 allotment.  Based on data from fiscal year 2012-2013, LADWP determined that only 8.7 percent of Schedule A customers used water in Tier 4.

---

water budgets, providing a base allotment of 6 HCF for a household of up to six people.  When it designed the new rate structure, LADWP eliminated the household size factor, finding it difficult to administer and not necessarily accurate because many customers did not report actual household size.

11

**b.** *The components of the tiered rates*

At the time the Drehers filed this action, the rate for each tier was comprised of various factors: (1) the base rate, which covers general costs of operating the water system and providing water service; (2) the water expense stabilization adjustment (WESA), which establishes funds to stabilize rates in the event of an unforeseen event affecting water service delivery, such as an earthquake; (3) the water infrastructure adjustment (WIA), which recovers capital costs associated with maintaining and improving the reliability of the water distribution system; (4) the low income subsidy adjustment (LISA), which we describe in more detail below; (5) the Owens Valley regulatory adjustment (OVRA), which recovers expenses for several projects in the Owens Valley; (6) the water quality improvement adjustment (WQIA), which recovers water quality related expenses to be used for various purposes; (7) the water supply cost adjustment (WSCA), which we describe in more detail below; and (8) the base rate revenue target adjustment (BRRTA), which adjusts rates up or down to account for variations between forecasted water consumption and expenses and actual water consumption and expenses. In the trial court, the Drehers did not challenge the water rates based on LADWP's application of the base rate, the WESA, the WIA, the OVRA, the WQIA, or the BRRTA. We accordingly focus our attention on the factors the Drehers challenged at trial as violating Proposition 218: the WSCA, the LISA, and a peak pumping and storage (PP&S) factor that LADWP applies to Tiers 3 and 4.

**1.** *The WSCA factor*

The WSCA is the factor LADWP uses to calculate the water supply costs in each of the four tiers. The WSCA formulas take

12

into account the unit price of each source of supply assigned to a tier and the amount of the projected customer demand for water that a source can meet within a tier.[6] As explained above, LADWP calculates the unit cost per HCF of each source of supply by dividing LADWP's cost to provide the supply by the forecasted hydrologic supply of that source. LADWP adjusts the WSCA factor every six months to reflect the most current costs for each source of supply.

In applying the WSCA, LADWP allocates the lowest cost water supply (LA Aqueduct) to Tier 1. When the volume of that supply is insufficient to cover the demand in Tier 1, LADWP assigns the second least expensive water supply (groundwater) to meet the demand in Tier 1. In other words, as one source of supply is exhausted, the WSCA formulas take into account the unit price of the next least expensive source of supply, until the forecasted hydrologic demand for the tier is met.[7] Thus, the WSCA factor applied to each tier takes into account the cost of all

---

[6] LADWP also applies the WSCA in Tiers 1 and 2 of other schedules. For purposes of the WSCA, projected demand for Tiers 1 and 2 includes water forecasted to be used in those other schedules.

[7] Written out, the WSCA formula for each tier is: the volume of the lowest cost water supply available to cover the demand in the tier, multiplied by the unit price of that supply, divided by the total volume of water to meet the demand in the tier; plus the volume of the next least expensive water supply available to cover the demand in the tier, multiplied by the unit price of that supply, divided by the total volume of water to meet the demand in the tier; and so on, until the demand in the tier is satisfied.

the sources of water that supply the tier. LADWP follows this process in all four tiers, assigning the costs of more expensive water incrementally as customers use more water and move into a higher tier of usage. LADWP mathematically assigns the sources of supply to the tiers (starting with the lowest cost source) because it is impossible, given the existing infrastructure, to actually trace water from a source of supply (LA Aqueduct, groundwater, MWD, recycled water) to each individual customer's residence.

### 2. *PP&S costs*

As LADWP explained in its rate study, it assigns PP&S costs ($0.228 per HCF) to Tiers 3 and 4 "to recover the cost of peak pumping and storage infrastructure only dispatched for above-normal water use." It assigns base pumping and storage costs equally across all four tiers to recover "the cost of infrastructure that supports pumping and storage required for base water use (indoor and efficient outdoor use)." In assigning costs in this manner, LADWP was guided by the approach in the American Water Works Association (AWWA) M1 Manual, "a manual used by public water agencies throughout the western United States." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1498.) LADWP determined costs for its distribution storage plant, operations and maintenance of storage facilities, pumping operations and maintenance, and pumping plant investment. LADWP then determined the portion of its pumping and storage costs that it incurred in order "to meet the peak demand caused

14

by the higher level of consumption" and assigned those costs as PP&S.[8]

### 3. *The LISA factor*

The LISA factor "recovered the cost of credits provided to lifeline and low-income customers." All Schedule A customers paid the LISA charge ($0.151 per HCF of water used) in each tier, except customers who received the credits against their water charges. For a 12-month period commencing on April 1, 2016, the LISA generated approximately $25,900,000 (an amount that includes LISA charges to customers on multiple schedules including Schedule A).

Under the new rates, adding all the above-described factors together, on April 15, 2016, a customer would pay a rate of $4.45 in Tier 1, $5.41 in Tier 2, $6.31 in Tier 3, and $7.91 in Tier 4, per HCF. All customers who had parcels with similar characteristics (lot size, temperature zone), and therefore had the same water budgets, would pay the same water rate in each tier per HCF of water used.

### 4. *The ordinance approving the water rates*

In December 2015, LADWP's Board passed resolutions recommending the City Council adopt the proposed water rates, and directing LADWP to mail notice to its customers of a public hearing on the proposed rate restructure and rate increases to be held before the City Council. The notice contained detailed information about the rate restructure, including explanation regarding the tiered water allotments and the components of the tiered rates, including the WSCA and the LISA. Prior to the

---

[8] LADWP spreads its total pumping and storage costs across several schedules, including Schedule A.

public hearing, LADWP held more than 80 rates presentations across the City and sent 1.8 million e-mails to stakeholders, among other forms of outreach.

On March 2, 2016, the City Council held a public hearing, and on March 16, 2016, it passed Ordinance No. 184130, approving the water rates effective April 15, 2016. The 53-page ordinance describes the rates in detail, including the tier structure, the water allotments, and the adjustment factors and formulas. The ordinance passed by unanimous vote of the 12 (of 16) councilmembers who were present.[9]

## D.    Procedural History

On August 22, 2018, the Drehers, through their attorneys, sent the City a class claim under the Government Claims Act (Gov. Code, § 810 et seq.), alleging LADWP's tiered water rate structure as well as the LISA component of the water rates violated substantive provisions of article XIII D, section 6, subdivision (b) (hereafter referred to as section 6(b)). The claim was deemed rejected because the City did not act on it within 45 days after the Drehers presented it. (See Gov. Code, § 912.4.)[10]

_____

[9] Because the Drehers do not contend the City failed to comply with any of the procedural requirements set forth in article XIII D, section 6, we will not include additional facts relating to such compliance.

[10] The Drehers did not withhold payment from LADWP. They paid their water charges in full when due, without indicating they disputed the charges until they filed their government claim.

16

The Drehers attached to their government claim (and later to their complaint) an LADWP water bill, dated May 16, 2018. The bill shows that during the applicable billing period covering 29 days, a total of 51 HCF of water was delivered to the Drehers' parcel, which is located in a medium temperature zone. This amount of water exhausted the parcel's entire Tiers 1-3 allotment (just over 19 HCF), plus approximately 32 HCF in Tier 4.

In March 2019, the Drehers, on behalf of themselves and other similarly situated persons and entities, filed this action against the City. In the operative first amended complaint/verified petition for writ of mandate, they alleged, "LADWP imposed water rates that are not anchored to the actual cost of water service to a given parcel," in violation of Proposition 218, specifically section 6(b). They sought, among other things, (1) a declaration that the City's water rates were unlawful; (2) "a writ of mandate ordering [the] City to comply with all mandatory duties imposed by article XIII D . . . including the duty to anchor rates to the actual cost of water service to a given parcel"; (3) a permanent injunction enjoining the City from engaging in the alleged "improper activities and practices"; and (4) monetary relief, including a class refund "equal to the difference between (a) the water charges paid by [the Drehers] and the Class on or after August 22, 2017 [one year before they filed their government claim], and (b) the maximum amount of the water charges that would have been imposed upon [the Drehers] if Schedule A had complied with the requirements of Proposition 218" (section 6(b)). The trial court stayed "the non-writ causes of action" pending determination of the petition for writ of mandate. Although the Drehers filed this case as a class action, no class was certified.

17

The Drehers filed a motion requesting permission to include expert testimony in their trial briefing and at trial that was not part of the underlying administrative record. They relied on a recently decided Proposition 218 property-related fees case, *Malott v. Summerland Sanitary District* (2020) 55 Cal.App.5th 1102 (*Malott*), in which the Court of Appeal concluded the trial court erred in excluding expert evidence on the ground that it was not part of the administrative record of the sanitary district's wastewater service rate action. The Drehers described the subject of the proposed expert testimony generally as an analysis of the administrative record, and they asserted that "the evidence contained in an expert declaration w[ould] provide highly relevant evidence supporting a challenge to the method of service fee allocation." They did not attach an expert declaration to their motion or describe the substance of the proposed expert testimony. The trial court denied the Drehers' motion, agreeing with the City's position that the Drehers could not present extra-record evidence in connection with their petition for writ of mandate under the circumstances presented in this case. The court concluded the Drehers did not show "the administrative record would have been inadequate to adjudicate [the] claims" in their writ petition.

The court trial in the writ proceeding was bifurcated, with a liability phase and thereafter a remedies phase. On March 17, 2023, the trial court issued a final statement of decision. As to liability, the court concluded the LISA component of the City's water rates violated section 6(b)(1) ("[r]evenues derived from the fee or charge shall not exceed the funds required to provide the property related service"), section 6(b)(2) ("[r]evenues derived from the fee or charge shall not be used for any purpose other

18

than that for which the fee or charge was imposed"), and section 6(b)(3) ("[t]he amount of a fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel"). The court reasoned, "The City may have compelling policy reasons to subsidize water rates paid by those who cannot afford higher rates, but it cannot raise revenues to do so by charging other ratepayers more than the cost of providing water service to their parcel, or by using the increased revenue for a purpose other than providing water service to the ratepayer." Moreover, "The amount of the LISA charge paid by each customer that does not receive LISA is not proportionally based on the actual cost of service the customer receives." The court's liability decision on the LISA is not at issue in this appeal.

The trial court further concluded that, aside from the LISA component, the City's tiered water rates did not violate section 6(b)(3)'s proportionality requirement. In deciding this issue, the court acknowledged its independent standard of review. The court noted in its statement of decision that the Drehers did not challenge the City's calculation of the cost of supplying water to any tier based on the City's allocation of water sources to that tier. The court explained that the Drehers' argument at trial was that the City could "not simply assign the lower cost water sources to Tier 1, and assign higher cost sources to higher Tiers." Rather, the Drehers argued, the City "must show which source of water was physically delivered, and in what proportion, at each Tier." The court rejected these arguments, concluding section 6(b)(3) does not require "a molecule-by-molecule analysis of the water actually used at each tier or by each parcel." The court noted that the *Capistrano* decision stated it "would seem like a

19

good idea" for a water agency to "pass[] on the incrementally higher costs of expensive water to incrementally higher users," so long as they "figure out the true cost of water, not simply draw lines based on water budgets." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1511.) The court concluded the City followed this rationale.

The trial court also rejected the Drehers' challenge to the City's allocation of PP&S costs to Tiers 3 and 4. The court found that the City determined the incremental pumping and storage costs linked to peak demand on the water supply (demand greater than that to satisfy indoor and efficient outdoor usage) and allocated those PP&S costs to Tiers 3 and 4. The City "allocated uniformly across [all] tiers" the costs it determined were "not variable by demand." The court concluded the City did not violate section 6(b)(3) by allocating "the incremental costs of pumping and storage caused by greater water demand to customers in those tiers that caused the demand."

Finally, the court ruled that the City's decision to set the parcels' water budgets based on efficient use of water, consistent with its water conservation goals, did not violate section 6(b)(3). The court concluded the tiered rates did not exceed the proportional cost of water service attributable to each parcel because the City ascertained the cost of providing water at each tier level by determining the cost of supplying water from each source, allocating the least expensive sources of water to "the more efficient water users,"[11] and allocating PP&S costs to

---

[11] In fact, *all* customers receive the benefit of being charged for the least expensive water sources in Tier 1, even less efficient water users who then go on to consume at the Tier 4 level.

20

parcels that used an amount of water that caused the City to incur those additional costs.

Turning to remedies, the trial court concluded the Drehers were not entitled to a prejudgment refund of the unlawful LISA charges they paid because they did not comply with the payment under protest requirement set forth in Health and Safety Code section 5472, and the government claim they submitted did not satisfy the requirement. The court rejected the Drehers' numerous arguments in support of their contention that this statutory provision is inapplicable, and we address each of the arguments below. The court concluded the Drehers were entitled to prospective relief "prohibiting [the City] from including the LISA charge in future water rates to all customers of all tiers of usage." The court also found that the Drehers were entitled to an award of attorney fees as the prevailing parties in the action.

On May 5, 2023, the trial court entered judgment. The same day, the clerk of the superior court issued a peremptory writ of mandate requiring the City to cease charging the LISA within 90 days after service of the writ and to refrain from charging the LISA unless and until it obtained voter approval pursuant to the California Constitution.[12] The writ also required the City to credit water service customers for all LISA charges imposed after entry of judgment and issuance of the writ.

On February 20, 2024, the City filed its second and final return to the writ, stating (1) that it ceased charging the LISA on

_____

[12] "[W]ater rates that exceed the cost of service" in violation of Proposition 218 "operate as a tax" and must "be submitted to the relevant electorate and approved by the people in a vote." (*Capistrano, supra,* 235 Cal.App.4th at p. 1515.)

21

July 20, 2023, 63 days after service of the writ, and (2) that by October 2, 2023, it had refunded to water service customers in all customer classes the LISA charges imposed between the date of entry of judgment and July 20, 2023, in a total amount of $1,908,963.17.

The Drehers filed a timely notice of appeal from the judgment. We granted two applications for permission to file amicus briefs regarding the applicability of Health and Safety Code section 5472 to water delivery charges, one from Howard Jarvis Taxpayers Association, and another from interested individuals Andrew Mollner, John McNeil, Jr., Rosalinda Rodriguez, and Aubrey Ford (collectively, Mollner et al.). The Drehers and the City each filed responses to the amicus curiae briefs.[13]

---

[13] On January 27, 2025, in connection with its response to Mollner et al.'s amicus curiae brief, the City filed a request for judicial notice of Senate Bill No. 1072, which added Government Code section 53758.5, providing in pertinent part: "If a court determines that a fee or charge for a property-related service, including water, sewer, and refuse collection, violates Section 6 of Article XIII D of the California Constitution, then the local agency shall, in the next procedure to impose or increase the fee or charge, credit the amount of the fee or charge attributable to the violation against the amount of the revenues required to provide the property-related service *unless a refund is explicitly provided for by statute*." (Sen. Bill No. 1072 (2023-2024 Reg. Sess.); Stats. 2024, ch. 323, § 1, italics added.) We deny the request for judicial notice, which the Drehers opposed, because it is not material to our analysis, based on our conclusion Health and Safety Code section 5472 is the applicable statutory refund remedy for the water charges at issue here.

Mollner et al. filed a request for judicial notice of six volumes of legislative history concerning the statutory scheme of which Health and Safety Code section 5472 is a part. We grant Mollner et al.'s unopposed request for judicial notice.

## DISCUSSION

**A. Failure to Comply With Health and Safety Code Section 5472 Bars the Drehers' Claim for a Refund of the Portion of the Water Charges Attributable to the LISA**

The Drehers and amici curiae contend the trial court erred in concluding the Drehers were barred from seeking a refund of the portion of their water charges attributable to the LISA, because they did not comply with the payment under protest requirement of Health and Safety Code section 5472 (hereafter referred to as section 5472).

### 1. *Statutory language*

Section 5472 provides, "After fees, rates, tolls, rentals or other charges are fixed pursuant to this article, any person may pay such fees, rates, tolls, rentals or other charges under protest and bring an action against the city or city and county in the superior court to recover any money which the legislative body refuses to refund. Payments made and actions brought under this section, shall be made and brought in the manner provided for payment of taxes under protest and actions for refund thereof in Article 2, Chapter 5, Part 9, of Division 1 of the Revenue and Taxation Code, insofar as those provisions are applicable."

Where section 5472 applies, payment under protest is a mandatory precursor to a lawsuit seeking a refund from a city (or

23

city and county).  (*Los Altos Golf & Country Club v. County of Santa Clara* (2008) 165 Cal.App.4th 198, 206 (*Los Altos*).)  For purposes of section 5472, "Payment under protest means giving written notice to the entity imposing the charges, at the time payment is made, indicating the payor believes the charge is invalid and intends to seek a refund."  (*Padilla v. City of San Jose* (2022) 78 Cal.App.5th 1073, 1077 (*Padilla*).)  The purpose of such "pay first" rules is to ensure that essential public services are not disrupted by interference with the flow of revenues to fund government operations during the time taxpayers or ratepayers litigate challenges to taxes or charges that fund those essential public services.  (*Carachure v. City of Azusa* (2025) 110 Cal.App.5th 776, 784.)

By its terms, section 5472 applies to "fees, rates, tolls, rentals or other charges . . . *fixed pursuant to this article.*"  (Italics added.)  Health and Safety Code section 5471 (hereafter referred to as section 5471) describes the way specified fees, rates, tolls, rentals, and other charges may be fixed under article 4, chapter 6, part 3, division 5 of the Health and Safety Code, the article where sections 5471 and 5472 appear.  Section 5471 states:

"(a) In addition to the powers granted in the principal act,[14] any entity[15] shall have power, by an ordinance or resolution approved by a two-thirds vote of the members of the legislative body thereof, to prescribe, revise and collect, fees, tolls, rates, rentals, or other charges for services and facilities furnished by it, either within or without its territorial limits, in connection with its water, sanitation, storm drainage, or sewerage system.

"(b) In addition to the powers granted in the principal act, any entity shall have power, pursuant to the notice, protest, and hearing procedures in Section 53753 of the Government Code, to prescribe, revise, and collect water, sewer, or water and sewer standby or immediate availability charges for services and facilities furnished by it, either within or without its territorial limits, in connection with its water, sanitation, storm drainage, or sewerage system.

---

[14] "Principal act" is not defined in article 4 or elsewhere in the Health and Safety Code. In the Cortese-Knox-Hertzberg Local Government Reorganization Act of 2000 (Gov. Code, § 56000 et seq.), for example, " '[p]rincipal act' means, in the case of a district, the law under which the district was formed and, in the case of a city, the general laws or the city charter." (Gov. Code, § 56065; cf. *Richmond v. Shasta Community Services Dist.* (2004) 32 Cal.4th 409, 430 (*Richmond*) [in applying section 5471 to a community services district, "the 'principal act' . . . providing its authority is the Community Services District Law (Gov. Code, § 61000 et seq.)"].)

[15] There is no dispute in this case that the City is an "entity" for purposes of section 5471.

"(c) The entity may provide that the charge for the service shall be collected with the rates, tolls, and charges for any other utility, and that any or all of these charges may be billed upon the same bill.  Where the charge is to be collected with the charges for any other utility service furnished by a department or agency of the entity and over which its legislative body does not exercise control, the consent of the department or agency shall be obtained prior to collecting water, sanitation, storm drainage, or sewerage charges with the charges for any other utility.  Revenues derived under the provisions in this section, shall be used only for the acquisition, construction, reconstruction, maintenance, and operation of water systems and sanitation, storm drainage, or sewerage facilities, to repay principal and interest on bonds issued for the construction or reconstruction of these water systems and sanitary, storm drainage, or sewerage facilities and to repay federal or state loans or advances made to the entity for the construction or reconstruction of water systems and sanitary, storm drainage, or sewerage facilities.  However, the revenue shall not be used for the acquisition or construction of new local street sewers or laterals as distinguished from main trunk, interceptor, and outfall sewers.

"(d) If the procedures set forth in this section as it read at the time a standby charge was established were followed, the entity may, by ordinance or resolution adopted by a two-thirds vote of the members of the legislative body thereof, continue the charge pursuant to this section in successive years at the same rate.  If new, increased, or extended assessments are proposed, the entity shall comply with the notice, protest, and hearing procedures in Section 53753 of the Government Code."

## 2. *The Drehers' arguments*

In support of their contention of error, the Drehers argue: (1) the statutory scheme of which section 5472 is a part does not apply to the water charges at issue here, but only to charges for sanitation and sewerage, including water *standby* charges but not water *delivery* charges;[16] (2) section 5472 is not an appropriate refund remedy for the constitutional violation at issue here; and (3) if any statutory refund procedure applies to the LISA charges, it is the Government Claims Act, with which the Drehers assert they complied.  For the reasons explained below, we reject these arguments.

A water standby charge is imposed " 'for making water available to property "whether the water . . . services are actually used or not." ' "  (*Wolstoncroft v. County of Yolo* (2021) 68 Cal.App.5th 327, 345.)  The water rates at issue here, of which the LISA factor was one component, were charges for water delivery.  Water delivery charges are incurred "for ongoing water service through an existing connection," after a property owner becomes a customer of a water agency.  (*Richmond*, *supra*, 32 Cal.4th at p. 427; *Wolstoncroft*, at p. 345.)

Heretofore no published decision has applied section 5472's payment under protest requirement to water delivery charges.  As the Drehers point out, the cases applying section 5472 arise in the context of sewer and garbage collection charges.  (See, e.g.,

---

[16] We reviewed amici curiae's briefs and considered the arguments they raise in support of their assertion that section 5472 does not apply to water delivery charges.  To the extent they make the same arguments regarding statutory interpretation as the Drehers, we will not lay out their arguments separately below.

27

*Los Altos*, *supra*, 165 Cal.App.4th 198 [sewer charges]; *Padilla*, *supra*, 78 Cal.App.5th 1073 [garbage collection charges].) This does not persuade us, however, that section 5472 is inapplicable to water delivery charges. In cases where plaintiffs have challenged water delivery charges, section 5472 was not referenced or applied because it was inapplicable on the facts of those cases as the defendant was a water district, and not a city or county as section 5472 requires, or because the water delivery charges were not fixed pursuant to section 5471 (e.g., by ordinance or as of 2017 by resolution). We are aware of no published decision in which a plaintiff sued a city (or city and county), challenging water delivery charges fixed in the specific manner prescribed in section 5471; and neither the Drehers nor amici curiae have cited one.

As an issue of first impression, we conclude the plain language of the statutory scheme requires that we apply section 5472 to the Drehers' claim against the City for a refund of the LISA portion of the water charges that were fixed pursuant to section 5471.

### 3. *Principles of statutory interpretation and standard of review*

" ' "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." ' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 803.) To that end, we " ' "first examine the statutory language, giving it a plain and commonsense meaning." [Citation.] We do not consider statutory language in isolation; instead, we examine the entire statute to construe the words in context. [Citation.] If the language is unambiguous, "then the Legislature is presumed

28

to have meant what it said, and the plain meaning of the language governs."  [Citation.]  "If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." ' "  (*Madrigal v. Hyundai Motor America* (2025) 17 Cal.5th 592, 602.)  We review a question of statutory interpretation de novo.  (*Ibid*.)

4.     ***Under the plain language of the statutory scheme, section 5472 applies to the Drehers' refund claim***

In interpreting a statute, the reason we begin with the text is because "statutory language typically is the best and most reliable indicator of the Legislature's intended purpose."  (*Larkin v. Workers' Comp. Appeals Bd.* (2015) 62 Cal.4th 152, 157.) " ' " 'Where the statute is clear, courts will not "interpret away clear language in favor of an ambiguity that does not exist." ' " ' " (*People v. Burke* (2023) 89 Cal.App.5th 237, 242.)

Section 5472's payment under protest requirement applies to "fees, rates, tolls, rentals or other charges . . . fixed pursuant to this article."  Under section 5471, subdivision (a), fees fixed pursuant to article 4 include "fees, tolls, rates, rentals, or other charges for services and facilities furnished by" the entity "in connection with its *water*, sanitation, storm drainage, or sewerage system," that are enacted by an ordinance or resolution "approved by a two-thirds vote of the members of the legislative body" of the entity.  (Italics added.)  The LISA charge was a component of the City's water rates, rates which the City charged for water service, enacted by an ordinance approved by more than a two-thirds vote of the members of the City Council.  The City's water rates are undoubtedly "charges for services and facilities

29

furnished by" the City "in connection with its water . . . system."
(§ 5471, subd. (a).) Thus, the plain language of the statutory
scheme demonstrates the challenged water rates, including the
LISA component, were charges fixed pursuant to article 4 within
the meaning of section 5472.[17] There is no requirement for the
City to state in its ordinance that the charges were fixed
pursuant to section 5471, in order for section 5472 to apply to the
charges. (*Padilla*, *supra*, 78 Cal.App.5th at p. 1079 [Plaintiffs
"assert that [garbage collection] fees were not fixed pursuant to
the Health and Safety Code unless the ordinance specifically

_____

[17] In their appellate reply brief, the Drehers argue section
5472 is inapplicable because the LISA itself is not a charge for
any *service* because those who paid it "received no service, no
benefit, or anything in exchange for the charge," so it could not
have been fixed pursuant to this statutory scheme. The Drehers
did not articulate this argument in their opening brief, and the
City did not have an opportunity to respond to it in this appeal.
" 'When an appellant fails to raise an issue in the opening brief,
raising it for the first time in a reply brief or at oral argument, we
generally decline to address the issue or address it in a summary
manner.' [Citation.] 'Obvious reasons of fairness militate against
consideration of an issue raised' so late." (*Ramirez v. Charter
Communications, Inc.* (2024) 16 Cal.5th 478, 500.) We reject this
argument in a summary manner, not only because it was raised
so late in this appeal but also because it does not require
elaboration. As we have already explained, the LISA was a
component of the rates the City charged for ongoing water *service*
to LADWP customers. In challenging the LISA, the Drehers
challenged these water service rates. Whether it was proper for
the City to include the LISA as a factor of the water service rates
is a separate question that has already been resolved against the
City and is not at issue in this appeal.

30

referenced the code.  We reject that argument because the relevant Health and Safety Code sections plainly do not require an express reference in order to fix fees pursuant to the code, nor do they require any particular language to be recited"].)

Disregarding the plain language of section 5471, subdivision (a), which expressly includes water service charges, the Drehers assert section "5472 relates to sanitation and sewerage service, not water service."  They point to headings in the Health and Safety Code where sections 5471 and 5472 appear: division 5 ("Sanitation"), part 3 ("Community Facilities"), chapter 6 ("General Provisions with Respect to Sewers"), article 4 ("Sanitation and Sewerage Systems").  We discern no inherent incongruity between water service on the one hand, and sanitation and sewerage systems on the other, and the Drehers describe none.  "A dictionary definition of sanitation is the 'prevention of disease by maintenance of sanitary conditions (as by removal of sewage and trash).' " (*Padilla*, *supra*, 78 Cal.App.5th at p. 1078.)  We can conceive of no situation in which water would be unnecessary for the maintenance of sanitary conditions.  But even assuming ongoing water service is *not* connected with sanitation and sewerage, we cannot ignore the express inclusion of water service charges within the ambit of section 5471, subdivision (a).  "Title or chapter headings are unofficial and do not alter the explicit scope, meaning, or intent of a statute." (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 602; *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1119.)  We may not rely on such headings " 'for the purpose of creating ambiguity when none exists.' " (*Woodland Park Management, LLC v. City of East Palo Alto Rent Stabilization Bd.* (2010) 181 Cal.App.4th 915, 923, fn. 5, citing *People v. Hull*

31

(1991) 1 Cal.4th 266, 272 [when a statute is ambiguous, however, "organization and section headings may properly be considered in determining intent and ' "are entitled to considerable weight" ' "].) In section 5471, subdivision (a), the Legislature unambiguously included charges for water service. We need not resort to title or chapter headings to interpret plain language that needs no clarification.

The Drehers also direct our attention to Health and Safety Code section 5470 (hereafter referred to as section 5470), which provides definitions of certain terms for purposes of article 4 and explains: "The following words wherever used in this article shall be construed as defined in this section, unless from the context a different meaning is intended, or unless a different meaning is specifically defined and more particularly directed to the use of such words." The Drehers point out that section 5470, subdivision (f), states the term " '[r]ates or charges' shall mean fees, tolls, rates, rentals, or other charges for services and facilities furnished by an entity *in connection with its sanitation or sewerage systems, including garbage and refuse collection.*" (Italics added.) This definition does not include the word "water."

Section 5470, subdivision (f)'s definition of "rates or charges" does not alter our conclusion that sections 5471 and 5472 apply to the water service charges at issue here, for the following reasons. Neither section 5472 nor section 5471 uses the shorthand term "rates or charges" (nor does any other section in article 4). Instead, each section describes with more specificity the "fees, rates, tolls, rentals or other charges" to which it applies. As set forth above, section 5472 applies to "fees, rates, tolls, rentals or other charges [that] are fixed pursuant to this article." And section 5471, subdivision (a), authorizes a specific method

("by an ordinance or resolution approved by a two-thirds vote of the members of the legislative body") for an entity to fix "fees, tolls, rates, rentals, or other charges for services and facilities furnished by it . . . in connection with its water . . . system," or its sanitation, storm drainage, or sewerage system. The Drehers and amici curiae posit that no "fees, rates, tolls, rentals or other charges" may be fixed pursuant to article 4 unless specifically enumerated in section 5470, subdivision (f)'s definition of "rates or charges." This, however, would effectively erase the words "water" and "storm drainage" from section 5471, subdivision (a), along with the express power granted in the provision to fix charges for water and storm drainage. Such a construction is untenable, not only under the plain language of section 5471, but also under the plain language of section 5470, which requires that the definitions be applied in article 4 "*unless* from the context a different meaning is intended, or *unless* a different meaning is specifically defined and more particularly directed to the use of such words." (Italics added.) A different and more expansive meaning of the words "rates" and "charges" is both intended and defined under the plain language of sections 5471 and 5472, as set forth above.[18]

_____

[18] Some appellate courts have referenced the definition of " 'rates or charges' " in section 5470, subdivision (f), in determining whether section 5472 applied to certain charges. (See, e.g., *Padilla, supra,* 78 Cal.App.5th at p. 1078 [quoting the definition and concluding that the "Legislature was clear that the charges described by section 5472 include those for garbage collection"]; see also *Rogers v. City of Redlands* (2025) 112 Cal.App.5th 667 [same as to the city's rates for solid waste collection].) Although we do not rely on the definition here, our analysis does not render section 5470, subdivision (f), nugatory as

33

The Drehers also point to the definition of "entity" in section 5470, subdivision (e), and note that this definition similarly does not include the word "water": " 'Entity' means and includes counties, cities and counties, cities, sanitary districts, county sanitation districts, county service areas, sewer maintenance districts, and other public corporations and districts authorized to acquire, construct, maintain and operate sanitary sewers and sewerage systems." Consideration of this definition does not alter our interpretation of sections 5471 and 5472 either. The city is an "entity" under section 5470, subdivision (a); section 5471, subdivision (a), specifically authorizes an entity to fix charges for water service; and section 5472's payment under protest requirement applies to charges fixed pursuant to section 5471. Why the Legislature chose not to expand the definition of entity to include all types of water agencies (e.g., water districts) is not a question we need to explore here because it is not material to whether section 5472 applies to the City's water delivery charges.

The Drehers also argue that notwithstanding section 5471, subdivision (a)'s plain language, the statute does not authorize cities to impose water delivery charges "given that California cities already had that authority long before [section] 5471 was

the Drehers argue. The definition is useful in confirming that the Legislature intended the application of article 4 to the charges specified in the definition. However, these cases do not compel a conclusion that the definition precludes application of section 5472 to water delivery charges, given the express language of section 5471, subdivision (a), which uses a more expansive definition of the fees, tolls, rates, rentals, or other charges to which it applies.

34

originally enacted . . . ." They cite cases from more than a century ago which indicate the California Constitution authorizes cities to fix water rates. (See, e.g., *City of South Pasadena v. Pasadena Land & Water Co.* (1908) 152 Cal. 579, 592.) Amici curiae Mollner et al. state more specifically that the City's power to fix water delivery charges arises from article XI, section 9 of the California Constitution, which provides:

"(a) A municipal corporation may establish, purchase, and operate public works to furnish its inhabitants with light, water, power, heat, transportation, or means of communication. It may furnish those services outside its boundaries, except within another municipal corporation which furnishes the same service and does not consent.

"(b) Persons or corporations may establish and operate works for supplying those services upon conditions and under regulations that the city may prescribe under its organic law."

Mollner et al. assert, "This constitutional authorization, however, does not encompass the authority to levy charges for sanitation or sewerage system services," so "section 5471 was and remains necessary to authorize charges for sanitation or sewerage systems." Their statutory interpretation, like the Drehers', effectively and untenably erases the word "water" from section 5471, subdivision (a). Moreover, they cite no authority indicating that the power granted in article XI, section 9 precludes the Legislature from enacting laws governing water delivery by municipalities, and we are aware of no such authority. (Compare *California Apartment Assn. v. City of Stockton* (2000) 80 Cal.App.4th 699, 707 [indicating that article XI, section 9 does not preclude the Legislature from regulating municipal utilities].)

35

While the Drehers and amici curiae dispute that section 5471 applies to water *delivery* charges, they concede that it applies to water *standby* charges.  Subdivision (b) of section 5471 provides:  "In addition to the powers granted in the principal act, any entity shall have power, pursuant to the notice, protest, and hearing procedures in Section 53753 of the Government Code, to prescribe, revise, and collect *water, sewer, or water and sewer standby or immediate availability charges*[19] for services and facilities furnished by it, either within or without its territorial limits, in connection with its *water*, sanitation, storm drainage, or sewerage system."  (Italics added.)  They argue that any references to water in section 5471, including those in subdivision (a), discussed above, are references to water standby charges.  They assert, without explanation, that water standby charges— charges imposed " 'for making water available to property "whether the water . . . services are actually used or not" ' "—are charges in connection with sanitation and sewerage, but water delivery charges—charges incurred "for ongoing water service through an existing connection," after a property owner becomes a customer of a water agency—are not.  (*Wolstoncroft*, *supra*, 68 Cal.App.5th at pp. 345, 344.)  In other words, under their argument, securing the means to access water on a property is connected with sanitation and sewerage, but actually using water delivered to the property is not.  This is belied by the LADWP bill the Drehers submitted in this action which appears to show that the sewer service charge imposed by LA Sanitation and billed by LADWP was specifically based on a certain amount of the

---

[19] Neither the Drehers nor amici curiae make a distinction between "standby" and "immediate availability" charges.

36

Drehers' water usage, suggesting a connection between water delivery and sanitation/sewerage.

Subdivision (b) of section 5471 separates water and sewer standby charges from the other water and sewer charges allowed under subdivision (a), because water and sewer standby charges are assessments. (Art. XIII D, § 6, subd. (b)(4) ["Standby charges, whether characterized as charges or assessments, shall be classified as assessments and shall not be imposed without compliance with Section 4"].) Subdivision (b) of section 5471 makes clear that the notice, protest, and hearing procedures applicable to assessments set forth in Government Code section 53753 apply to water and sewer standby charges. The water service charges in this case are not assessments, so subdivision (b) of section 5471 is not applicable here. If the Legislature intended that standby charges are the only type of water charges that may be fixed under section 5471, it would have made that clear in subdivision (a), instead of stating more generally that subdivision (a) grants entities the power to prescribe and collect charges for services and facilities in connection with an entity's water system. Under the Drehers' and amici curiae's statutory interpretation, it would make no sense to have any reference to the power to levy water charges in subdivision (a), because the power to fix water standby charges is expressly granted in subdivision (b).

Moreover, if the Drehers' and amici curie's interpretation of section 5471 were taken to its logical conclusion, the only sewer charges that could be fixed pursuant to section 5471 would be sewer standby (or immediate availability) charges. This would have to be the result because the language pertaining to water charges in subdivisions (a) and (b) mirrors that pertaining to

37

sewer charges.  Under subdivision (a), an entity may fix charges for services and facilities furnished by it in connection with its water or sewerage system.  Under subdivision (b), an entity may fix water and/or sewer standby charges.  Therefore, if subdivision (b) means that only water standby charges may be fixed pursuant to section 5471 regardless of the inclusion of water systems in subdivision (a), then it would necessarily follow that only sewer standby charges may be fixed pursuant to section 5471 regardless of the inclusion of sewerage systems in subdivision (a).  However, we know from case law that entities are authorized to fix sewer *services* fees pursuant to section 5471.  (See, e.g., *Boynton v. City of Lakeport Mun. Sewer Dist.* (1972) 28 Cal.App.3d 91, 94.)  Based on identical language, entities must also be authorized to fix water service fees under section 5471.  Any other construction is illogical.

In *Richmond, supra*, 32 Cal.4th 409, our Supreme Court employed language supporting our interpretation that, in the context of water charges, section 5471's applicability is not limited to standby assessment charges but also applies to water service fees.  There, the Court held a water capacity charge that a community services district imposed as a condition for making a new connection to a water system was not an assessment within the meaning of article XIII D and was not subject to article XIII D's restrictions on assessments.  (*Id.* at p. 415.)  In responding to the plaintiffs' argument that the district was required by section 5471 (and other laws) to use an ordinance rather than a resolution to increase existing water connection fees, the Court noted that section 5471 did not apply because the district did not qualify as an "entity" within the meaning of the statute.  The Court went on to state:

38

"Moreover, even if we assume that Health and Safety Code section 5471 applies to the District, that provision, by its terms, confers authority '[i]n addition to' the authority otherwise granted to a public entity.  In other words, its main purpose is to supplement rather than to limit a public agency's authority to impose charges for *water or sewer services* in connection with a *water or sewerage system*.  For a public agency organized as a community services district, the 'principal act' (*ibid*.) providing its authority is the Community Services District Law (Gov. Code, § 61000 et seq.).  As we have seen, Government Code section 61621 authorizes community services districts to establish charges for *water services* without requiring that they act by ordinance rather than by resolution, and Government Code section 66016, part of the Mitigation Fee Act (Gov. Code, § 66000 et seq.), expressly authorizes districts to use either a resolution or an ordinance to impose or increase a *service charge*.  We do not read Health and Safety Code section 5471 as limiting or abrogating that authority." (*Richmond, supra*, 32 Cal.4th at p. 430, italics added.)[20]  The Court thus indicated that by its terms, section 5471 applies to fees for water services.  The Court did not interpret an entity's power to levy water charges under section 5471 as limited to water standby assessments only.

The Drehers and Mollner et al. assert the legislative history of section 5471 confirms that it authorizes entities to fix water standby charges but not water delivery (service) charges.

---

[20] Effective January 1, 2017, the Legislature amended section 5471 to provide that entities may fix charges thereunder by *resolution* in addition to ordinance.  (Sen. Bill No. 974 (2015-2016 Reg. Sess.); Stats. 2016, ch. 366, § 16.)

Although we conclude the text of section 5471, subdivision (a), is clear in authorizing entities to fix water delivery charges, we will consider the legislative history in a manner consistent with the rules of statutory interpretation. The "plain meaning rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose." (*Huff v. Securitas Security Services USA, Inc.* (2018) 23 Cal.App.5th 745, 755, citing *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735; *R.D. v. Superior Court* (2025) 108 Cal.App.5th 1227, 1242-1243.) However, "Absent a clearly expressed legislative intention to the contrary, [the] language [of a statute] must ordinarily be regarded as conclusive." (*Consumer Product Safety Commission v. GTE Sylvania, Inc.* (1980) 447 U.S. 102, 108.) "If the legislative history gives rise to conflicting inferences as to the legislation's purposes or intended consequences, then a departure from the clear language of the statute is unjustified." (*Faria v. San Jacinto Unified School Dist.* (1996) 50 Cal.App.4th 1939, 1945 (*Faria*); citing *People v. Boyd* (1979) 24 Cal.3d 285, 295.)

**5.** ***Legislative history does not clearly demonstrate a legislative purpose contrary to that apparent from the plain language of the statutory scheme***

**a.** ***Enactment of sections 5470-5472***

In 1945, the Legislature enacted then section 5470 (later renumbered section 5471, as explained below), which provided: "Any city or city and county shall have power, by an ordinance approved by a two-thirds vote of the members of the legislative body thereof, to prescribe, revise and collect, fees, tolls, rates, rentals, or other charges for services and facilities furnished by it in connection with its *sanitation or sewerage systems*; provided that the city and city and county may provide that such charge

40

for such service shall be collected with the rates, tolls and charges for any other utility, and that any or all such charges may be billed upon the same bill; provided, further, that where such charge is to be collected with the charges for any other utility service furnished by a department or agency of such city or city and county and over which the legislative body of the city or city and county does not exercise control, the consent of such department or agency shall be obtained prior to collecting *sanitation or sewage*[21] *charges* with the charges for any other utility.  Revenues derived by cities and cities and counties under the provisions in this section shall be used only for the acquisition, construction, reconstruction, maintenance and operation of *sanitation or sewerage facilities*; provided, however, that such revenue shall not be used for the acquisition or construction of new local street sewers or laterals as distinguished from main trunk, interceptor and outfall sewers." (Assem. Bill No. 302 (1945 Reg. Sess.); Stats. 1945, ch. 979, p. 1877, § 5, italics added.)  As originally enacted, this section made no mention of "water."

In 1947, the Legislature enacted then section 5471 (later renumbered section 5470, as explained below), which provided, in full:  "Counties, sanitary districts, county sanitation districts, and sewer maintenance districts shall have all the powers provided in Section 5470 with respect to a city or city and county."  (Assem. Bill No. 2606 (1947 Reg. Sess.); Stats. 1947, ch. 1367, p. 2917, § 2.)

---

[21] By a 1949 amendment, the Legislature replaced the word "sewage" with "sewerage" here.  (Assem. Bill No. 100 (1949 Reg. Sess.); Stats. 1949, ch. 319, p. 608, § 1.)

In 1949, the Legislature added section 5472, the payment under protest statute, and has not amended it since. (Assem. Bill No. 1933 (1949 Reg. Sess.); Stats. 1949, ch. 865, p. 1638, § 2.)

In 1951, the Legislature amended then section 5470 to include three references to "water systems" in the part of the statute concerning use of revenues: "Revenues derived by cities and cities and counties under the provisions in this section, shall be used only for the acquisition, construction, reconstruction, maintenance and operation of *water systems and* sanitation or sewerage facilities, to repay principal and interest on bonds issued for the construction or reconstruction of such *water systems and* sanitary or sewerage facilities and to repay federal or state loans or advances made to such city or city and county for the construction or reconstruction of *water systems and* sanitary or sewerage facilities . . . ." (Sen. Bill. No. 333 (1951 Reg. Sess.); Stats. 1951, ch. 719, p. 1984, § 1, italics added.)[22] As Mollner et al. point out, the League of California Cities supported this amendment before the Legislature and characterized it as "a perfectly logical grant of power," "[i]n view of the complete interdependence of sewers and water systems." (Richard Carpenter, Legal Counsel, League of California Cities, letter to Beach Vasey, Legislative Secretary, Governor's Office re Sen. Bill No. 333, May 21, 1951; Legislative Memorandum, Governor's Office re Sen. Bill No. 333, May 28, 1951.)

---

[22] The existing language regarding repayment of principal and interest on bonds and loans was added by earlier amendment in 1949. (Assem. Bill No. 100 (1949 Reg. Sess.); Stats. 1949, ch. 319, p. 608, § 1.)

In 1953, the Legislature renumbered section 5470 to 5471 and amended the statute by, among other things, replacing the words "city or city and county" with the word "entity." (Sen. Bill No. 706 (1953 Reg. Sess.); Stats. 1953, ch. 862, p. 2206, § 1.) At the same time, the Legislature renumbered section 5471 to 5470 and rewrote it in its present form with the list of definitions, including "[e]ntity" and "[r]ates or [c]harges." (Sen. Bill. No. 706 (1953 Reg. Sess.); Stats. 1953, ch. 862, p. 2207, § 2.) The original definition of entity in section 5470, subdivision (e), is nearly identical to the present definition, except that the Legislature added "county service areas" to the definition in 2008. (Sen. Bill No. 1458 (2007-2008 Reg. Sess.); Stats. 2008, ch. 158, § 10.) As to the definition of rates or charges in section 5470, subdivision (f), the original definition is the same as the current one, except that in 1972, the Legislature added the words "including garbage and refuse collection" to the end of the definition and specified that the amendment "does not constitute a change in, but is declaratory of, the preexisting law." (Sen. Bill No. 475 (1972 Reg. Sess.); Stats. 1972, ch. 100, p. 138, § 1.)

In 1973, the Legislature added the following (italicized) language to section 5471: "Any entity shall have power, by an ordinance approved by a two-thirds vote of the members of the legislative body thereof, to prescribe, revise and collect, fees, tolls, rates, rentals, or other charges, *including sewer standby or immediate availability charges,* for services and facilities furnished by it, either within or without its territorial limits, in connection with its sanitation or sewerage system . . . ." (Assem. Bill No. 823 (1973-1974 Reg. Sess.); Stats. 1973, ch. 545, p. 1048, § 1, italics added.)

43

**b.**    *In 1988, the Legislature granted entities the power to fix water charges under section 5471*

In 1988, the Legislature amended section 5471 to allow an entity to fix charges in connection with its water system: "In addition to the powers granted in the principal act, any entity shall have power, by an ordinance approved by a two-thirds vote of the members of the legislative body thereof, to prescribe, revise and collect, fees, tolls, rates, rentals, or other charges, including *water,* sewer standby or immediate availability charges, for services and facilities furnished by it, either within or without its territorial limits, in connection with its *water,* sanitation, or sewerage system.  However, the entity may provide that the charge for the service shall be collected with the rates, tolls, and charges for any other utility, and that any or all of these charges may be billed upon the same bill.  Where the charge is to be collected with the charges for any other utility service furnished by a department or agency of the entity and over which its legislative body does not exercise control, the consent of the department or agency shall be obtained prior to collecting *water*, sanitation or sewerage charges with the charges for any other utility."  (Sen. Bill No. 2263 (1988 Reg. Sess.); Stats. 1988, ch. 706, § 1, italics added.)  Entities retained the power granted by the 1951 amendment to use revenues derived from charges fixed under the statute for their water systems.  (*Ibid*.)

The Drehers and amici curiae argue that the 1988 amendment only authorized entities to fix water *standby* charges and no other water charges.  The plain language of the amendment, however, was not so limited.  As quoted above, it granted entities the power to impose "charges, including *water,*

44

sewer standby or immediate availability charges, for services and facilities furnished by it, either within or without its territorial limits, in connection with its *water,* sanitation, or sewerage system." (Stats. 1988, ch. 706, § 1, italics added.)  Nothing the legislative history suggests we should deviate from its plain language, which applies generally to water charges in connection with a water system.

In determining the intended purpose of legislation, legislative committee and bill reports " 'are appropriate sources from which legislative intent may be ascertained,' " and Legislative Counsel's digests " 'are entitled to great weight.' " (*Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1401.)

After Senate Bill No. 2263 was introduced, the Senate Committee on Agriculture and Water Resources and the Senate Rules Committee indicated the bill included authorization for entities to impose charges for services and facilities related to their water systems, in the same manner the existing statute authorized entities to impose charges for services and facilities related to their sanitation and sewerage systems:  "An entity is presently authorized, by ordinance (2/3 vote of the legislative body opposing [*sic*]) to prescribe, revise, and collect fees, tolls, rates, rentals and other charges for services and facilities furnished by it as they relate to its sanitation and sewerage system.  Collection and use of funds is stipulated.  [¶]  SB 2263 includes water systems within the authorization and makes related changes." (Sen. Com. on Agriculture and Water Resources, Rep. on Sen. Bill No. 2263 (1987-1988 Reg. Sess.) as amended Apr. 4, 1988; Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 2263 (1987-1988 Reg. Sess.) Apr. 6, 1988; see also Sen. Rules Com., Off. of Sen. Floor Analyses,

45

Rep. on Sen. Bill No. 2263 (1987-1988 Reg. Sess.) Aug. 3, 1988.) These committee reports described the subject of the bill as "Water systems: fees and other charges" (or similarly as, "Water systems – fees and charges"). (*Ibid.*) They did not describe the bill as limited to water standby charges.

The legislative history shows that after the Senate approved the bill and it moved to the Assembly, the Association of California Water Agencies (ACWA) expressed concern that the 1988 proposed amendment to section 5471, as originally drafted, would prevent its members from imposing water rates and charges in a manner permitted under their principal acts, and instead require them to fix such charges by ordinance approved by a two-thirds vote of their legislative bodies. (ACWA Exec. Director and Gen. Counsel John P. Fraser, letter to Sen. Barry Keene re Sen. Bill No. 2263, Apr. 12, 1988 ["As I am sure you are aware, we constantly must adjust our rates and charges depending on programs and needs within our water agencies. Enforcing a vote requirement would produce absolute chaos for us in our operations"]; Fraser, letter to Assemblyman Dominic Cortese re Sen. Bill No. 2263, Apr. 19, 1988 [same].) The ACWA suggested the Legislature amend the bill to include the following language at the beginning of the statue: "In addition to the powers provided in the principal act . . . ." (*Ibid.*) The Assembly adopted nearly identical language, amending the bill before it passed both houses, to state, "In addition to the powers granted in the principal act . . . ." (Assem. Com. on Local Gov., Rep. on Sen. Bill No. 2263 (1987-1988 Reg. Sess.) as amended May 17, 1988, p. 2; Stats. 1988, ch. 706, § 1.)

While the bill was pending in the Assembly, the Assembly Committee on Local Government noted in its analysis that the co-

sponsors of the bill, "the Russian River County Water District and the Windsor County Water District, state that the bill is intended merely to clarify that water standby and immediate availability fees may be collected for the maintenance and operation of water systems." (Assem. Com. on Local Gov., Rep. on Sen. Bill No. 2263 (1987-1988 Reg. Sess.) as amended May 17, 1988, p. 2.) The committee analysis thus described the bill as, "provid[ing] back-up authority for the levy of water standby charges, subject to a two-thirds vote of the local legislative body, for the construction, maintenance and operation of water systems." (*Id*. at p. 1.)

However, an earlier letter sent to the bill's author on behalf of the Russian River County Water District—a letter which was described by staff of the Assembly Committee on Local Government as setting forth the problem in the law that the bill sought to remedy—did not suggest that the amendment should be limited to water standby and immediate availability charges rather than applied to water charges generally. (Assem. Com. on Local Gov., Background Information Request, May 17, 1988; Michael P. Merrill, Merrill & Thompson, letter to Joan Dockerson, Legislative Assistant to Sen. Barry Keene, July 9, 1987.) In the letter, counsel for the Russian River County Water District suggested the Legislature amend section 5471 to address the following issue: "Although the referenced code section [section 5471] clearly indicates that revenues collected under this process can be used for the maintenance and operation of water systems, it does not clearly allow for the collection in the

47

preceding language of that section." (Merrill letter, at p. 1.)[23] As we have already explained, section 5471, as it existed prior to this 1988 amendment, authorized entities to collect sanitation and sewerage charges, including but not limited to sewer standby and immediate availability charges, but it did not include language regarding collection of charges related to water systems.

After the bill moved back to the Senate, Senate committee floor analyses continued to describe the bill as expanding entities' authorization to collect charges for services and facilities furnished by them in connection with their water systems, in the same manner they were already authorized to collect charges in connection with their sanitation and sewerage systems. (See, e.g., Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 2263 (1987-1988 Reg. Sess.) Aug. 3, 1988.) Senate committee analyses did not interpret the bill as limiting entities' authorization to collect water charges to water standby charges only, notwithstanding their acknowledgement of the statements attributed to the Russian River County Water District and the Windsor County Water District. (*Ibid*.)

The final version of the Legislative Counsel's Digest included the more expansive view of the bill described in the Senate rather than the narrower view of the bill described in the

---

[23] We reference the letters sent on behalf of the ACWA and the Russian River Water District as well as legislative staff's comments regarding the latter to explain the chronology of events relating to the Assembly's amendment and to give context to statements in legislative committee reports. We acknowledge that these letters and staff comments are not indicative of the Legislature's collective intent in enacting the bill, and we do not use them for that purpose.

Assembly.  After describing the scope of an entity's authorization to impose charges under existing law, the digest states:  "This bill would add water systems to this authorization."  (Legis. Counsel's Dig., Sen. Bill No. 2263 (1987-1988 Reg. Sess.).)

The Legislature never amended the bill to include language limiting entities' power regarding imposition of water charges to water standby and immediate availability charges only, even after the ACWA expressed worry that the draft bill would inject chaos into the determination of its member agencies' water rates. The bill, as passed by the Legislature, stated that it applied to charges for services and facilities in connection with an entity's water system, which would include charges for water services, just as it had included charges for sanitation and sewerage services.

We need not summarize herein the entire body of legislative history related to the 1988 amendment that is in the record before us.  We have examined the entire legislative history provided and conclude that it "gives rise to conflicting inferences as to the legislation's purposes or intended consequences," and therefore "a departure from the clear language of the statute is unjustified."  (*Faria, supra*, 50 Cal.App.4th at p. 1945.)  The plain language of the 1988 amendment and the current version of section 5471 do not limit the applicable water charges to water standby or immediate availability charges only, and the ambiguous legislative history surrounding the 1988 amendment does not compel a statutory interpretation that departs from the plain language.

The " 'Legislature is a collective entity and its "intentions" are primarily known by its legislative acts. . . .  The statutes themselves embody the collective "intention" of the Legislature.

49

"[W]henever a law is adopted, all that is really agreed upon is the words." ' " (*People v. Cruz* (1996) 13 Cal.4th 764, 786, italics omitted.) The words agreed upon here do not include the limitation the Drehers and amici curiae read into the statute.

### c.    *Subsequent amendments to section 5471*

In 1991, the Legislature amended section 5471 to grant entities the power to prescribe and collect charges for services and facilities furnished by them in connection with their storm drainage systems. (Sen. Bill No. 682 (1991-1992 Reg. Sess.); Stats. 1991, ch. 1110, § 35.)

In 2007, the Legislature amended section 5471 and numerous other laws to conform to the requirements of Proposition 218 and its implementing statutes, which had limited local officials' powers to levy standby assessments. (Sen. Bill No. 444 (2007-2008 Reg. Sess.); Stats. 2007, ch. 27, § 11.) In amending section 5471, the Legislature redrafted it in its current form, with subdivisions (a)-(d). As discussed above, subdivision (a) grants entities the power to prescribe and collect charges for services and facilities furnished by them in connection with their water, sanitation, storm drainage, and sewerage systems. The first sentence of section 5471 in the 2007 amendment is identical to that in the 1988 amendment, except the former does not contain the phrase "including water, sewer standby or immediate availability charges" in describing the applicable charges. Thus, in the 2007 amendment, there is no mention in subdivision (a) of standby or immediate availability charges. Subdivision (b) grants entities the power to prescribe and collect water and sewer standby or immediate availability charges for services and facilities furnished by them in connection with their water, sanitation, storm drainage, or sewerage systems, and specifies

50

that the notice, protest, and hearing procedures in Government Code section 53753 (part of the Proposition 218 Omnibus Implementation Act) apply to the imposition of such charges. Like subdivision (a), subdivision (c) includes text that existed before the 2007 amendment (e.g., language regarding collection of charges for different utility services on the same bill, and permissible use of revenues derived from charges fixed pursuant to section 5471). Subdivision (d) includes additional language added by the 2007 amendment regarding standby charges and compliance with the procedures set forth in Government Code section 53753.

Finally, as already noted above, in 2016, the Legislature amended section 5471 to provide that entities may fix charges thereunder by *resolution* approved by a two-thirds vote of the members of their legislative bodies, in addition to an ordinance approved in the same manner. (Sen. Bill No. 974 (2015-2016 Reg. Sess.); Stats. 2016, ch. 366, § 16.)

In sum, in 1988, the Legislature added three references to "water" in section 5471. The Legislature also amended the statute by adding the words, "[i]n addition to the powers granted in the principal act," to address the ACWA's concerns that the bill would "inject chaos" into water agencies' operations. The water districts that co-sponsored the bill apparently attempted to clarify the bill's scope by stating that the amendments were merely intended to clarify the authority to levy water standby charges. However, the Legislature did *not* amend the bill to limit "water" with the word "standby." The final Legislative Counsel's Digest described the bill broadly as expanding the statute's authorization regarding the levy of charges to include water systems. Any indication in the legislative history of intent to

51

limit the 1988 amendment to water standby charges was not "clearly expressed" by the Legislature such that it would justify our departure from the plain language of the statute under our rules of statutory interpretation. (*Consumer Product Safety Commission v. GTE Sylvania, Inc.*, *supra*, 447 U.S. at p. 108; *Faria*, *supra*, 50 Cal.App.4th at p. 1945.)

> **6.**     ***Section 5472 provides an appropriate retrospective remedy for refund of charges that violate Proposition 218***

The Drehers suggest Proposition 218 provides an independent retrospective refund remedy for charges that violate its provisions, separate from section 5472. However, no provision of Proposition 218 or its implementing statutes (Proposition 218 Omnibus Implementation Act, Gov. Code, § 53750 et seq.) prescribes such a remedy. Where section 5472 applies to charges, Proposition 218 does not provide a retrospective refund remedy for plaintiffs who fail to comply with the payment under protest requirement of section 5472. *Carachure v. City of Azusa* (2025) 110 Cal.App.5th 776 demonstrates the point. There, the Court of Appeal explained that although section 5472 barred the plaintiffs from seeking a refund from the city because they did not pay sewer and trash fees under protest, a point the plaintiffs conceded, they could still challenge the constitutionality of the fees under Proposition 218 and obtain other relief (e.g., a rate reduction) if successful. (*Id.* at pp. 785, 791-792.) At trial, the Drehers sought two types of relief: (1) cessation of the unconstitutional LISA charges, resulting in a prospective reduction in water rates and a refund of LISA charges paid after issuance of the judgment and the writ, and (2) a retrospective remedy in the form of a refund of LISA charges paid

prejudgment. They achieved the former and the latter is precluded because they did not comply with the payment under protest requirement of section 5472. The Drehers cite no authority indicating otherwise.[24]

The Drehers contend application of section 5472 to their claim for a refund of LISA charges violates their right to due process under the Fourteenth Amendment to the United States Constitution because it does not constitute a " 'clear and certain remedy' " for the unlawful charges. In support of their contention, they cite *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Florida* (1990) 496 U.S. 18, 22, which held, when a state requires taxpayers "to pay first and obtain review of the tax's validity later in a refund action, the Due Process Clause requires the State to afford taxpayers a meaningful opportunity to secure postpayment relief for taxes already paid pursuant to a tax scheme ultimately found unconstitutional." To satisfy due process, the "postdeprivation procedure" for seeking a refund must "provide a 'clear and certain remedy.' " (*Id*. at p. 51.)

The Drehers cite no authority providing that section 5472 is an inadequate remedy for a refund of charges found to violate Proposition 218, and our research has uncovered none. Notwithstanding that, they assert numerous arguments as to

---

[24] At oral argument, the Drehers suggested that if we remand the matter, the trial court could fashion some other type of retrospective remedy other than a refund, an argument not raised in their appellate briefing. The Drehers did not ask the trial court for an alternate retrospective remedy, and they may not seek such a remedy for the first time on appeal.

53

why section 5472 is not a clear and certain remedy *in this case*, each of which we reject below.

### a. *The City did not hide the LISA charge from customers*

The Drehers argue that a payment under protest requirement did not afford them a meaningful remedy here because they "had no realistic way to even know they were being charged the LISA, much less that it was unconstitutional, since the LISA was buried in the rate and did not appear on their monthly water bills." We need not address the legal validity of this argument because the factual premise on which it depends is unequivocally false based on the record before us. The Drehers direct us to pages in the record where their exemplar water bill is found. Page four of that bill lists the "Water Rate Adjustment Factors" that their water rates were comprised of, including the "Low-Income Subsidy" (the LISA). Not only is the LISA specifically referenced there, but the bill also discloses the exact dollar amount of the LISA per HCF of water used. We also note that the water rate ordinance at issue here, passed by the City around three years before the Drehers filed this action, expressly references the LISA, describes its purpose, and explains how it was calculated as a factor of the water rates. Thus, the Drehers' assertion that they "had no realistic way to even know they were being charged the LISA" is directly contradicted by the record they provided.

### b. *The Drehers misplace blame on the City for their failure to comply with section 5472*

The Drehers blame the City for their failure to comply with section 5472. They suggest the City had an obligation to instruct them regarding compliance with section 5472. However, neither

54

section 5472 nor any other authority cited by the Drehers placed such an obligation on the City.

They further assert the City specifically "instructed" LADWP customers to file a government claim "for any billing challenge." This argument is forfeited because they did not raise it below. (See *Miller v. Pacific Gas & Electric Co.* (2023) 97 Cal.App.5th 1161, 1170 ["It is a fundamental principle that an appellate court will generally not consider an issue presented for the first time on appeal that could have been but was not presented in the trial court"].) In any event, we note that none of the evidence the Drehers cite supports their new argument. For example, they direct us to a document in the record titled, "Filing a Claim with LADWP FAQ," and a claim form in the record titled, "Claim to Dept. of Water & Power." Neither of these documents indicates a government claim is the appropriate procedure for seeking a refund of disputed water charges, let alone *instructs* a customer to file a government claim for a billing challenge. The FAQ (frequently asked questions) document explains that covered claims under the Government Claims Act generally include "losses that occur due to our negligence, as defined by the California Government Code," and references claims for property damage, bodily injury, business interruption, food loss, and miscellaneous losses such as hotel, restaurant, and rental car charges. The sample claim form advises claimants, "YOU HAVE 6 MONTHS TO FILE A CLAIM FOR DEATH, PERSONAL INJURY, OR DAMAGE TO PERSONAL PROPERTY, AND 1 YEAR TO FILE A CLAIM FOR DAMAGE TO REAL PROPERTY OR FOR ANY OTHER TYPE OF INCIDENT." The Drehers' citations to the City's Administrative Code and Charter fare no better. Although both include

provisions regarding government claims, neither instructs a utility customer to file a government claim for a billing dispute. (See L.A. Admin. Code, div. 5, ch. 10, art. 1, § 5.169; L.A. Charter, § 350.)  In fact, the Administrative Code acknowledges that other laws may apply to some claims for money or damages against the City:  "Every claim for money or damages against the City, or any officer, board or department thereof, *except as otherwise provided by law*, shall be filed with the City Clerk, who shall thereupon present the same to the board, officer or employee authorized to incur or pay the expenditure or alleged indebtedness or liability represented thereby. . . ."  (L.A. Admin. Code, div. 5, ch. 10, art. 1, § 5.169, italics added.)  Section 5472 is one such exception to the general government claims procedures.

        c.      ***The Drehers point to no legal authority indicating their refund claim is subject to the Government Claims Act***

The Drehers argue that if a "diligent citizen" were to "consult" the Government Claims Act and relevant case law, these authorities "would counsel them to file a government claim for a refund" of the water charges.  We disagree.

Government Code section 905, a provision of the Government Claims Act, provides in pertinent part:

"There shall be presented in accordance with Chapter 1 (commencing with Section 900) and Chapter 2 (commencing with Section 910) all claims for money or damages against local public entities *except any of the following*:

(a) Claims under the Revenue and Taxation Code or other statute prescribing procedures for the *refund*, rebate, exemption, cancellation, amendment, modification, or adjustment of any tax, assessment, *fee, or charge or any portion of the charge*, or of any

56

penalties, costs, or related charges. . . .  (Italics added.)  The plain language of the exception set forth in section 905 indicates that a claim for a refund of water charges (or a portion of the water charges) may fall within an exception to the Government Claims Act.  Case law closes the loop.  In *McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 621, our Supreme Court specifically referenced section 5472 as a "*statute* providing for a refund" that falls within Government Code section 905, subdivision (a)'s exception to Government Claims Act procedures.  (See also *Ardon v. City of Los Angeles* (2011) 52 Cal.4th 241, 251 ["a class claim by taxpayers for a tax refund against a local governmental entity is permissible under section 910 [of the Government Claims Act] in the absence of a specific tax refund procedure set forth in an applicable governing claims statute"].)

In support of their contention that section 5472 is not the appropriate remedy here, the Drehers point to cases in which the plaintiffs sought a retrospective class refund of unlawful water charges after filing a government claim (and apparently not paying the charges under protest pursuant to section 5472).  What the Drehers fail to acknowledge is that none of the cases they cite present facts under which section 5472 could have been applied.

For example, the Drehers rely on *Plata v. City of San Jose* (2022) 74 Cal.App.5th 736, 747-752, in which the Court of Appeal concluded that the plaintiffs' class action claim for a refund of tiered water rates they alleged violated Proposition 218 was barred because they failed to present a government claim on the issue.  There is no indication in the opinion that the city's water rates were fixed pursuant to article 4 of the Health and Safety Code as required for application of section 5472 (by an ordinance

57

approved by a two-thirds vote, pursuant to the pre-January 1, 2017 version of section 5471 applicable to the rates at issue in the case).  In other words, the facts presented in *Plata* do not show that the conditions for application of section 5472 were satisfied, even if the court had concluded section 5472 applied to water delivery charges.  Thus, the *Plata* court's application of the Government Claims Act does not support the Drehers' position that section 5472 is inapplicable to their refund claim against the City regarding water delivery charges that were fixed pursuant to section 5471.  (See also *Daneshmand v. City of San Juan Capistrano* (2021) 60 Cal.App.5th 923 [claims for refund of tiered water rate charges barred for failure to file a timely government claim; no facts stated in the opinion indicating water rates were fixed pursuant to article 4 of the Health and Safety Code such that section 5472 could have been applicable].)

In *Howard Jarvis Taxpayers Association v. Coachella Valley Water District* (2025) 108 Cal.App.5th 485, 492, 514-516 (*Coachella Valley*), a case in which the plaintiff contended the district's water rates violated article XIII C of the California Constitution, the Court of Appeal rejected the district's argument that the plaintiff's failure to pay the charges under protest under section 5472 barred a refund claim.  The appellate court explained that section 5472 was inapplicable because it "contemplates payment under protest only as a precursor to suits against *a city or city and county* that has imposed an . . . exaction" under article 4 of the Health and Safety Code, and not to suits against other water utilities.  (*Id*. at p. 515, italics added.)  The court did *not* suggest section 5472 is inapplicable to water delivery charges, as the Drehers argue here.

58

Ignoring that section 5472, by its terms, was inapplicable to the plaintiff's action against the water district, the Drehers assert that the *Coachella Valley* "court considered the ability of a ratepayer to meet the purpose of a 'pay under protest' requirement through service of a government claim and concluded, as Dreher has argued here, that a government claim 'enables the public entity to engage in fiscal planning for potential liabilities' just as any pay under protest requirement would." The Drehers take the *Coachella Valley* court's analysis on this point out of context. Providing the necessary context, the court stated: "The Water District asserts that all water utilities need predictable finances and that our reading [that section 5472 does not apply to the Water District] would frustrate that goal. However, the Legislature's decision to confine a protest requirement to suits against cities or cities and counties is not so unreasonable that it could not have been intended. This is especially true when, as here, a plaintiff submits a written claim under the Government Claims Act and thus ' "enable[s] the public entity to engage in fiscal planning for potential liabilities." ' " (*Coachella Valley*, *supra*, 108 Cal.App.5th at p. 516.) The court did *not* decide or imply that a government claim could satisfy section 5472's payment under protest requirement as a precursor to an action against a city. Rather, the court acknowledged that the Legislature decided to impose a payment under protest requirement for suits against cities or cities and counties, and no other entities.

We are aware of no published decision in which a plaintiff sued a city (or city and county) and obtained a refund of water delivery charges fixed in the specific manner prescribed in section 5471, after filing a government claim but failing to pay the

charges under protest under section 5472; and the Drehers have cited none.  Accordingly, we reject their argument that "relevant case law" indicates the Government Claims Act, not section 5472, was the appropriate procedure for them to secure a refund.

> ### d. *Section 5472 unequivocally includes a payment under protest requirement*

The Drehers also argue that section 5472 is not a clear and certain refund remedy because "diligent citizen[s] . . . would have no way of knowing how to comply" if they attempted to follow its instructions.  They take issue with the second sentence of section 5472 (italicized here):  "After fees, rates, tolls, rentals or other charges are fixed pursuant to this article, any person may pay such fees, rates, tolls, rentals or other charges under protest and bring an action against the city or city and county in the superior court to recover any money which the legislative body refuses to refund.  *Payments made and actions brought under this section, shall be made and brought in the manner provided for payment of taxes under protest and actions for refund thereof in Article 2, Chapter 5, Part 9, of Division 1 of the Revenue and Taxation Code, insofar as those provisions are applicable.*"  (Italics added.) They note that the payment under protest provisions in article 2 of the Revenue and Taxation Code (applicable to property taxes) were repealed in 1976, 27 years after the adoption of section 5472, as the Court of Appeal explained in *Los Altos*, *supra*, 165 Cal.App.4th at pages 206-207.  The provisions concerning refund actions that are referenced in section 5472 remain in article 2, chapter 5, part 9, division 1 of the Revenue and Taxation Code. (See Rev. & Tax. Code, § 5140 et seq.; *Los Altos*, at p. 205.)

We agree with the *Los Altos* court that section 5472's direction is clear:  a ratepayer who wants to bring an action

against a city or a city and county for a refund of charges must first pay the charges under protest. (*Los Altos*, *supra*, 165 Cal.App.4th at p. 207.) Section 5472 directs ratepayers to the provisions in article 2, chapter 5, part 9, of division 1 of the Revenue and Taxation Code, "insofar as those provisions are applicable." (§ 5472.) Clearly the payment under protest provisions formerly in article 2 of the Revenue and Taxation Code are no longer applicable. However, the Legislature has not amended section 5472 to eliminate its payment under protest requirement. (*Los Altos*, at p. 207.)

> e. ***The Drehers have not shown that LADWP's billing dispute resolution procedure is incompatible with section 5472***

The Drehers note the following language on their LADWP bill:

"**IF YOU QUESTION YOUR LADWP CHARGES**

"Please contact a representative by calling the Customer Service Telephone Number or by going into any of the Department of Water and Power Customer Service Centers listed on the back of your payment stub or email us using our Customer Service form at www.ladwp.com/contactus. After receiving an explanation, you may ask for more information from a supervisor. If you still disagree with the charges, you have a right to a management-level review. To ask for a management-level review, send a written request to LADWP Customer Relations Office, P.O. Box 51111, Los Angeles, CA 90051-0100. You must pay the undisputed portion of the bill within 7 days of the request for a management-level review. Your account will be reviewed and you will be informed of the result."

61

There is no evidence the Drehers used this billing dispute resolution procedure or contemplated using it.  Nonetheless they complain that it might have misled them not to comply with section 5472 by paying only the undisputed portion of the bill and not paying the entire amount under protest as required under section 5472.  However, this is a separate and unrelated procedure that is not a prerequisite for filing a lawsuit against the City.  Assuming a customer takes advantage of this procedure and the dispute is not resolved favorably, the Drehers point to nothing barring the customer from paying the remaining, disputed portion of the bill under protest and thereafter filing a lawsuit seeking a refund.

In sum, section 5472 afforded the Drehers an appropriate refund remedy for the unlawful LISA charges, but they failed to comply with the payment under protest requirement.  Consequently, their claim for a retrospective refund is barred.

**B.     The City's Tiered Water Rates Comply With the Proportionality Requirement of Article XIII D, section 6, subdivision (b)(3) of the California Constitution**

The Drehers argue the City did not meet its burden to demonstrate that its tiered water rates comply with section 6(b)(3), which provides, "The amount of a fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel."  Therefore, they contend the trial court erred in finding in favor of the City on this issue.  For the reasons explained below, we conclude the Drehers have not shown error.

### 1. *Burden of proof*

When a plaintiff challenges the constitutionality of a charge under section 6(b)(3), the agency bears the burden at trial of demonstrating compliance with the constitutional provision. (§ 6(b)(5) ["In any legal action contesting the validity of a fee or charge, the burden shall be on the agency to demonstrate compliance with this article"].) Neither Proposition 218 nor its implementing statutes prescribe a specific method of establishing compliance with section 6(b)(3). "To carry its burden, the agency must generally provide evidence identifying the data used, analyzing the cost of service, and demonstrating the proportionality of" the charge. (*KCSFV I, LLC v. Florin County Water Dist.* (2021) 64 Cal.App.5th 1015, 1030 (*KCSFV*); *Coziahr v. Otay Water Dist.* (2024) 103 Cal.App.5th 785, 797 (*Coziahr*).) When setting rates for water service, it is axiomatic that "future costs of such services must be projected, or estimated." (*Patz v. City of San Diego* (2025) 113 Cal.App.5th 225, 285 (*Patz*).)

To comply with section 6(b)(3), an agency that imposes tiered water rates must show that its rates are proportional to the "ascertainable cost of the service that can be attributed to a specific . . . parcel." (*Capistrano, supra*, 235 Cal.App.4th at p. 1505; *Coziahr, supra*, 103 Cal.App.5th at p. 800.) Therefore, an agency must "do more than merely balance its total costs of service with its total revenues," and then "simply draw lines based on water budgets" to allocate the costs among the tiers. (*Capistrano*, at pp. 1506, 1511.) Rather, the agency must "correlate its tiered prices with the actual cost of providing water at those tiered levels." (*Id*. at p. 1506.) In doing so, "there is nothing at all in [section 6](b)(3) or elsewhere in Proposition 218 that prevents water agencies from passing on the incrementally

63

higher costs of expensive water to incrementally higher users." (*Id*. at p. 1511.)

Nor is there any provision of Proposition 218 that prohibits an agency from considering the water conservation restrictions set forth in article X, section 2 of the California Constitution[25] when fixing water rates. However, "article X, section 2, and article XIII D [must] be harmonized." (*Coziahr*, *supra*, 103 Cal.App.5th at p. 810.) In other words, an agency may not use the goal of water conservation as a justification for imposing rates that exceed the cost of service attributable to a parcel. (*Ibid*.)

A trial court must exercise its independent judgment in deciding if a charge is constitutional under Proposition 218. (*Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448-449 (*Silicon Valley*); *Capistrano*, *supra*, 235 Cal.App.4th at p. 1507.) In doing so, the court must "liberally" construe Proposition 218's provisions " 'to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent.' " (*Silicon Valley*, at p. 448, quoting Ballot Pamp., Gen. Elec. (Nov. 5, 1996), text of Prop. 218, § 5, p. 109.)

_____

[25] Article X, section 2 provides, in pertinent part, "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. . . ."

We must be mindful that "(1) there is not necessarily only one reasonable or acceptable method of cost apportionment in section 6(b)(3) cases, and (2) agencies are not required to rely on 'perfect' data." (*Patz*, *supra*, 113 Cal.App.5th at p. 268, citing *Morgan*, *supra*, 223 Cal.App.4th at p. 918.) "Rather, ' "the section 6(b) fee or charge must reasonably represent the cost of providing service." ' " (*Patz*, at p. 268, quoting *KCSFV*, *supra*, 64 Cal.App.5th at p. 1029.) It is "for the trial court to decide in the first instance" if the agency "substantiate[d] [its] analysis with data that meaningfully captured the cost of service to the parcel." (*Coziahr*, *supra*, 103 Cal.App.5th at p. 803.)[26]

### 2. *Our standard of review*

We exercise our independent judgment in deciding if a charge is constitutional under Proposition 218. (*Silicon Valley*, *supra*, 44 Cal.4th at p. 448; *Capistrano*, *supra*, 235 Cal.App.4th at p. 1507.) We accord no deference to an agency's determination of the constitutionality of its rates. (*Coziahr*, *supra*, 103 Cal.App.5th at p. 798, citing *Morgan*, *supra*, 223 Cal.App.4th at p. 912.) "[I]t is not enough that the agency have substantial evidence to support its action. That substantial evidence must itself be able to withstand independent review." (*Capistrano*, at p. 1507; *Patz*, *supra*, 113 Cal.App.5th at p. 263.)

---

[26] A detailed discussion of the facts of the cases on which the Drehers rely, such as *Coziahr* and *Patz*, is not warranted because each water agency had a very fact-specific method of accounting for its costs and setting its water rates. Our benchmark in deciding the legality of the City's water rates in this case is the California Constitution, not the noncomparable rate structures of other water agencies.

Unlike the trial court, we do not decide disputed issues of fact. (*Coziahr*, *supra*, 103 Cal.App.5th at p. 798, citing *Morgan*, *supra*, 223 Cal.App.4th at p. 913 ["although we use a de novo standard of review here, we do not transform into a trial court"].) "Thus, if an 'appellant challenges a finding of fact, we must employ the substantial evidence standard of review.'" (*Coziahr*, at p. 798, quoting *Morgan*, at p. 917.) "'As such, we are not concerned about a conflict in the evidence. . . . "Rather, it is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld."'" (*City of San Buenaventura v. United Water Conservation Dist.* (2022) 79 Cal.App.5th 110, 119-120; *Patz*, *supra*, 113 Cal.App.5th at p. 271.) We do not reweigh the evidence. (*Coziahr*, at p. 817.) And where multiple inferences may be drawn from the evidence, we must accept the inference drawn by the trial court, if reasonable. (*Patz*, at p. 271.) In a challenge to the cost proportionality of an agency's water rates, we "treat the sufficiency of [the agency's] analytical methods and data as factual questions." (*Coziahr*, at pp. 798-799 & fn. 9.)

General appellate presumptions apply, even under the de novo standard of review. (See *Coziahr*, *supra*, 103 Cal.App.5th at pp. 802-803.) Thus, "We presume that an appealed judgment is correct." (*Moore v. City of Lemon Grove* (2015) 237 Cal.App.4th 363, 368-369, citing *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Patz*, *supra*, 113 Cal.App.5th at p. 275.) "[I]t is the appellant's responsibility to affirmatively demonstrate error . . . by citation to the record and any supporting authority." (*Morgan*, *supra*, 223 Cal.App.4th at p. 913.)

### 3. *The City complied with section 6(b)(3)*

For the majority of the components of the water rates—the base rate (including base pumping and storage costs), the WESA, the WIA, the OVRA, the WQIA, and the BRRTA—the City allocated the costs equally among each of the four tiers. The Drehers do not challenge the City's methodology, cost data, or cost calculations for any of these components of the water rates, and they concede the City's allocation of these costs was proportional. Here, we are evaluating the constitutionality of the City's tiered rates without the LISA.

The Drehers contend the manner in which the City set the water budgets for each tier and allocated the water supply costs (using the WSCA) and the PP&S costs among the tiers resulted in water charges that were not cost proportional in violation of section 6(b)(3). We conclude the Drehers' arguments have no merit. Based on substantial evidence withstanding our independent review, we conclude the City proved its tiered water rates did "not exceed the proportional cost of the service attributable to the parcel," within the meaning of section 6(b)(3).

#### a. *The Constitution requires proportionality, not exactness*

Before we delve into the specifics of how the City's water rate structure complies with the California Constitution, we address and reject the Drehers' overarching assertion that tiered water rates that allocate the differing costs of water supplies among the tiers run afoul of section 6(b)(3) unless a water agency is able to track the amount of the specific source(s) of supply used in each tier by each parcel and show that the least expensive water is actually used in the lower tiers and the most expensive water is actually used in the higher tiers. In other words, the

67

Drehers' proposed standard would require the City to trace the flow of water from each source (LA Aqueduct, groundwater, MWD, and recycled water) directly to each parcel and calculate the amount of water the parcel uses from each source in each tier. The Drehers' proposed standard would not only be virtually impossible to meet, but more importantly, it does not align with what the Constitution requires. The Constitution requires proportionality, not exactness.

As we previously explained, the City mixes together the water from the various sources before it subjects the mixture to water quality treatment and then delivers it to customers through its complex and expansive network. Adoption of the Drehers' argument would effectively ban the use of tiered water rates (absent approval by the electorate) by any California water agency that obtains its water from multiple sources of supply with differing costs, unless the agency has an impossibly complex and inefficient infrastructure that isolates each source of supply for separate water quality treatment; delivers each source of supply to residential customers through separate piping; and records the amount of water each parcel uses from each source of supply. We do not believe the voters who adopted Proposition 218 intended to require such an excessively and unnecessarily complicated infrastructure to comply with section 6(b)(3), especially because such infrastructure would undoubtedly be extremely expensive to build and maintain, a result which would almost certainly increase water charges—the exact opposite of the intent of Proposition 218.

Moreover, even if such a water system were theoretically possible to build and operate, it is doubtful the Drehers' proposed standard could achieve the proportionality that section 6(b)(3)

requires.  Because the volume of each source of supply varies, and no one source can meet the demand of all customers, parcels would be charged a higher or lower rate for the same volume of usage based on which source of supply happens to be available when they turn on their tap.  For example, assuming the City could dispatch the sources of supply from least to most expensive, the lowest cost supply would likely be quickly depleted by the highest and most inefficient users.  Meanwhile, the most efficient users may turn on their tap to find that only more expensive sources of supply are available.

The Constitution does not require the City to trace the flow of water from each source of supply to each parcel, molecule by molecule.  As *Capistrano* explains, section 6(b)(3) requires a water agency to determine the "*ascertainable* cost of the service that can be attributed to a specific . . . parcel." (*Capistrano, supra*, 235 Cal.App.4th at p. 1505, italics added.)  Determining the exact sources of water used by each parcel in each tier is not ascertainable, for the reasons we have already explained.  Thus, *Capistrano* suggests that water agencies employing tiered rates "pass[] on the incrementally higher costs of expensive water to incrementally higher users." (*Id*. at p. 1511.)  The *Capistrano* court did *not* suggest that water agencies must trace water from source of supply to parcel.  If that were required, the agency would not be "*passing on* the incrementally higher costs of expensive water to incrementally higher users." (*Ibid*., italics added.)  Rather, the agency would be charging each parcel based on the exact sources of water it uses.  However, constitutional proportionality does not require that level of exactness.  As the *Capistrano* court cogently stated, an agency need not "calculate a rate for 225 Elm Street and then calculate another for the house

69

across the street at 226." (*Id*. at p. 1515.) Section 6(b)(3) requires that water rates be *proportional* to the cost of service attributable to the parcel; it does not require an exact measure of the cost of service at each individual parcel.

Notwithstanding that section 6(b)(3), by its terms, requires proportionality not exactness, the Drehers find support for their proposed water tracing approach in *Patz, supra*, 113 Cal.App.5th 225, a recent case from the Fourth District, Division Two. There, a divided Court of Appeal affirmed a judgment in favor of ratepayers who challenged the constitutionality of the City of San Diego's water rates. (*Id*. at pp. 238-239.) The majority concluded the city's tiered water rates did not comply with section 6(b)(3) because, among other reasons, "no evidence showed that the units of water consumed by SFR [single family residential] customers in Tier 1 came from City's lower cost, local water supplies. Rather, City commingled all of its water sources in reservoirs before delivering the water to customers. Thus, City was unable to tie its local water supplies, and lower costs, to Tier 1 usage. . . . '[B]ecause the City commingles all its water and delivers it to customers using the same infrastructure, the City cannot ensure' as City had claimed, that City's 'higher-cost "alternative sources of supply" [were] being delivered to customers whose use led to the City's "greater investments" in those sources of supply.' " (*Id*. at p. 277.)

Neither the Drehers nor the *Patz* majority abide the approach posited in *Capistrano* endorsing a tiered rate structure that "pass[es] on the incrementally higher costs of expensive water to incrementally higher users." (*Capistrano, supra*, 235 Cal.App.4th at p. 1511.) We conclude the approach described in *Capistrano* is sound, as did the dissent in *Patz*. (*Patz, supra*, 113

70

Cal.App.5th at pp. 328, 333 (dis. opn. of Menetrez, J.).)  That approach is cost proportional in that it "passes on the elevated costs of additional supply 'to those customers whose marginal or incremental extra usage requires' that additional supply, so that 'lower-than-average users' do not have to bear the costs of additional supply that 'their levels of consumption do not make necessary.' "  (*Id.* at p. 333 (dis. opn. of Menetrez, J.), quoting *Capistrano*, at p. 1503.)  We read nothing in section 6(b)(3) that would require a water agency to trace drops of water from source of supply to parcel as the Drehers and the *Patz* majority suggest.[27]

Following *Capistrano*'s guidance, the City designed a tiered water rate structure that complies with section 6(b)(3).  The City sets water budgets for Tiers 2 and 3 based on specific characteristics of the parcel (lot size, temperature zone/zip code), so that similar parcels bear proportional costs; the City passes on the incremental costs of more expensive water and PP&S to customers whose higher demand for water necessitates those costs; and the City calculates the ascertainable water supply costs within each tier using the WSCA formulas.  We address each of these elements of the City's rate structure.

### b.    Water budgets

The Drehers contend the City did not prove it complied with section 6(b)(3)'s cost proportionality requirement because

---

[27] The *Patz* court affirmed the judgment and concluded the City of San Diego's water rates were unconstitutional based on multiple grounds that are not pertinent to the facts of the present case.  Thus, we have no cause to evaluate the correctness of the disposition in *Patz*.

"[t]here is no evidence the City set the water budgets to correspond with the costs in each tier." In support of this contention, the Drehers make two main arguments against the City's water budgets: (1) a water agency may not base tier breakpoints on conservation measures or assumptions about customers' water use, absent a cost justification; and (2) water allotments that result in customers reaching Tier 3 and 4 breakpoints at differing levels of water usage, based on lot size, temperature zone, and season, violate section 6(b)(3) unless the agency determines that the actual cost to supply water to a customer varies depending on lot size, temperature zone, and season. We reject these arguments as reading requirements into section 6(b)(3) that do not exist.

In a tiered water rate structure, the agency establishes the levels of water usage at which a customer leaves a lower tier and enters a higher tier (i.e., the breakpoint) with an incrementally higher water rate. Tiered water rates "are perfectly consonant with article XIII D, section 6, subdivision (b)(3)," so long as they "correspond to the actual cost of providing service *at a given level of usage*." (*Capistrano, supra*, 235 Cal.App.4th at pp. 1497-1498, italics added.) In other words, once a water agency sets its tiered breakpoints—the "given level[s] of usage"—it must determine the actual cost of providing water service *within each tier*. What an agency cannot do is "merely balance its total costs of service with its total revenues," and then "simply draw lines based on water budgets" to allocate its total costs among the tiers. (*Id*. at pp. 1506, 1511.)

Establishing tier breakpoints requires a water agency to make decisions about the amount of HCF to allot between each tier breakpoint, thereby determining the water budget in each

tier. The agency need not set a water budget tailored for each individual parcel's use. (See *Capistrano*, *supra*, 235 Cal.App.5th at p. 1515.) Here, the City made determinations about efficient indoor and outdoor use and set tier breakpoints to encourage conservation. An agency may consider its water conservation obligations and goals in setting its water rates, so long as it also complies with Proposition 218. (*Capistrano*, at pp. 1508-1511; *Coziahr*, *supra*, 103 Cal.App.5th at p. 810 ["article X, section 2, and article XIII D [must] be harmonized"].)

We disagree with the *Patz* majority's conclusion that to comply with section 6(b)(3), a water agency must have a cost-based justification for where it sets tier breakpoints (e.g., that it costs the agency more to supply the next HCF of water that places the customer in the higher tier). (*Patz*, *supra*, 113 Cal.App.5th at pp. 282-283.) As the dissent in *Patz* explained, section 6(b)(3) does not impose such a requirement: "As long as rates do not exceed proportional costs, section 6(b)(3) is satisfied. In fact, the tier breakpoints can be completely arbitrary without violating section 6(b)(3). A utility could, in principle, draw lines between tiers at random, with no cost-based or other justification at all, and as long as the utility calculates the costs between the lines and sets rates that do not exceed those costs, there is no violation of section 6(b)(3)." (*Id*. at p. 318, italics omitted (dis. opn. of Menetrez, J.).) To be sure, a utility would be wise to avoid setting "random" breakpoints if it hopes to maintain the public confidence. The point is: Nothing in section 6(b)(3) prohibits the use of tiered breakpoints, regardless of where the breakpoint is set. Thus, we reject the Drehers' assertion that basing tier breakpoints on conservation measures or general assumptions about customers' water use violates section 6(b)(3).

The Drehers complain that parcels reach Tiers 3 and 4 at different levels of water usage based on lot size, temperature zone, and season. We have already rejected the crux of their argument against this design—that there must be a cost-based justification for setting water budgets in this manner. To the extent the Drehers contend proportionality cannot be achieved unless each parcel receives the same water allotment in each tier, we reject the contention. Section 6(b)(3) prohibits an agency from imposing a property related charge that "exceed[s] the proportional cost of the service attributable to the parcel." In setting the water budgets, the City considered the specific characteristics of the parcel (lot size, temperature zone) to ensure that parcels with similar irrigation needs were treated similarly. In other words, it set water budgets that are proportional to the parcel.

The Drehers make arguments based on the false premise that tiered water rates must be perfect to be constitutional. They propose hypothetical scenarios about how individual parcels may use water. For example, they assert that some parcels may use all their water for indoor use and none for irrigation. In setting water budgets, however, there is no requirement that the City consider how each individual parcel serviced by LADWP uses water.

The Drehers also argue that the City's rate structure could have a perverse effect on conservation because customers allotted larger water budgets (because their parcels are large and located in hotter areas) could "waste" more water and still pay a lower overall water rate per month than customers allotted smaller water budgets. This argument ignores that customers pay per HCF of water they use, so the use of more water necessarily

74

increases their water charges.  The increase in charges is intended to act as a "price signal" to encourage conservation.  In any event, so long as the method is constitutional, the best way to incentivize conservation is a legislative judgment that we do not second guess.  In other words, we are not being asked to determine if the water budgets effectively incentivize conservation; the question is whether the water budgets comport with the Constitution—and they do.

The City's approach of considering the characteristics of the parcel when setting the water budgets and allowing customers who choose to use less water to pay a lower water rate, does not violate section 6(b)(3) in letter or spirit.

### c.  *The WSCA (water supply cost adjustment factor)*

The Drehers contend the City employed the same methodology here that the Court of Appeal struck down in *Capistrano*:  Determine the amount of revenue the water agency needs to generate to cover the costs of providing water service to an entire customer class, and then allocate fixed percentages of the total costs to each tier in order to collect the requisite amount of overall revenue, without calculating the actual ascertainable costs of providing water service at each tiered level.  (See *Capistrano*, *supra*, 235 Cal.App.4th at pp. 1499, 1506, 1507.)  However, this case is not factually similar to *Capistrano*.  Rather, we pick up where *Capistrano* left off and evaluate the water rates of an agency that actually calculated costs within the tiers.

As we described above, the City calculated the unit price per HCF of each of the four sources of its water supply.  (Compare *Capistrano, supra*, 235 Cal.App.4th at p. 1500 [although the city obtained water from five separate sources, the

75

appellate record only contained information regarding the cost of obtaining water from one of the five sources].)  The City adjusts the WSCA factor every six months to reflect the most current costs for each source of supply.  The Drehers do not challenge the methodology, data, or calculations the City used to determine the unit price of water for each source of supply.

To calculate the costs of water in each tier, the City uses a formula that accounts for the unit price of each source of supply and the amount of forecasted demand that source is expected to meet within the tier.  If a source of supply is not enough to meet demand in the tier, the formula takes into account the cost of the next, least expensive source of water.  The calculation changes as the amount of the supply source available to meet the demand in any given tier fluctuates up or down, thereby measuring ascertainable costs of water within the tier.

In applying the WSCA formulas, the City assigns the lowest cost water supply (LA Aqueduct) to Tier 1 until the forecasted supply of that source is exhausted.  When the volume of the lowest cost water supply is insufficient to meet the forecasted demand in Tier 1, the City assigns the second least expensive water supply to meet the remaining demand in Tier 1. The City follows this process in all tiers, assigning the costs of more expensive water incrementally as customers use more water and move into a higher tier of usage.  Every customer benefits from the lower cost water in the lower tiers, and every customer pays for the higher marginal cost in the higher tiers, *if the customer reaches that tier*.

It is important to note that the WSCA formulas are dynamic, as the City points out.  For example, if there were an increase in projected supply of LA Aqueduct water such that it

could meet the forecasted demand in all four tiers, the formulas would ensure the same WSCA factor in all four tiers. Or, for example, if there were a decrease in demand for water—perhaps a sign that conservation measures were working— tier prices would adjust accordingly and the number of tiers needed to account for all hydrologic demand would decrease.

The *Capistrano* court explained that when water agencies "pass[] on the incrementally higher costs of expensive water to incrementally higher users," section 6, "subdivision (b)(3) does require they figure out the true cost of water, not simply draw lines based on water budgets." (*Capistrano*, *supra*, 235 Cal.App.4th at pp. 1510-1511.) Here, the City determined the true cost of water from each source (the unit price per HCF); and then, after using the WSCA formulas to allocate the sources of supply to the tiers, the City determined the cost of supplying each source in each tier based on the forecasted demand that source could meet in the tier. Thus, the City demonstrated that its rates are proportional to the "ascertainable cost of the service that can be attributed to a specific . . . parcel." (*Id*. at p. 1505; *Coziahr*, *supra*, 103 Cal.App.5th at p. 800.)

As previously discussed, we reject the Drehers' contention that the City failed to comply with section 6(b)(3) when it used the WSCA formulas to allocate the least expensive sources of supply to the lower tiers and the most expensive sources to the higher tiers. In asserting that the City has no data or evidence regarding the actual costs of providing water in any tier, what the Drehers mean is that the City cannot trace which source of supply is used by a particular parcel in a given tier. As we explained, the Constitution does not require the City to trace the flow of water from each source of supply to each parcel, molecule

77

by molecule. Rather, the City must determine the actual, ascertainable costs of supplying water within each tier and charge customers proportionally.

The Drehers argue that evidence in the record "actually *disproves*" the City's "premise that water usage in the higher tiers causes the need for more expensive MWD water." They reference a pie chart in LADWP's July 2015 Water System Rate Action Report that shows that between fiscal years 2010 and 2014, on average, LADWP obtained 52 percent of its overall water supply from MWD, 33 percent from the LA Aqueduct, 12 percent from groundwater, and 1 percent from recycled water. They cite statistics from the same report showing that for fiscal year 2015-2016, LADWP forecasted that Tiers 3 and 4 would account for approximately 12.1 percent of the total water usage of Schedule A. Based on these pieces of evidence, they assert, "Even if customers eliminated all so-called 'less efficient' or 'excessive' water use in Tiers 3 and 4, the City would still need the MWD water to supply the remaining 39.9% (52% minus 12.1%) of its total water demand." This is a red herring. The Drehers seem to imply that Tiers 3 and 4 bear the brunt of the cost of the MWD water and that the lower tiers use expensive MWD water without paying for it. Not so. The same July 2015 report they cite shows that for fiscal year 2014-2015, MWD water would supply part of the demand of Tier 1, all of the demand of Tier 2, part of the demand of Tier 3 (and none of the demand of Tier 4), as well as part of the demand of the other schedules. This is exactly what the WSCA formulas take into account when setting the cost per tier. The Drehers either ignore or misunderstand the WSCA formulas, which ensure that when lower cost supply sources are insufficient to meet the forecasted demand in a tier, the next

78

least expensive source of supply is allocated to that tier to meet the remaining demand. Thus, the City allocates the water costs proportionally and each tier only pays the portion of the cost of supply necessary to meet the demand in that tier.

The amount of water from each source of supply fluctuates from year to year. In December 2015, LADWP forecasted that as of July 2016, MWD water would supply part of the demand of Tier 2, all of the demand of Tier 3, and part of the demand of Tier 4. As we explained, the cost formulas account for these fluctuations, taking into account the amount of the supply available to meet the demand in any given tier, and charging customers accordingly and proportionally.[28]

The trial court did not err in concluding the City complied with section 6(b)(3) when it applied the WSCA factor.

### d. *PP&S (peak pumping and storage) costs*

The Drehers contend the City's allocation of PP&S costs to Tiers 3 and 4 "exceed[s] the proportional cost of the service to the parcel," in violation of section 6(b)(3). As set forth above, the City allocates base pumping and storage costs across all four tiers. The City allocates PP&S costs ($0.228 per HCF) to Tiers 3 and 4.

The Drehers assert there is no evidence in the administrative record supporting the following factual findings in the trial court's statement of decision: The City "considered

---

[28] We note that in *Patz*, in contrast, the city charged its customers in Tier 1 only for the lower cost water supplies even though those supplies were insufficient to supply the entire demand in Tier 1. (*Patz*, *supra*, 113 Cal.App.5th at pp. 277-278.) Thus, the City of San Diego did not charge its customers in Tier 1 a proportional share of the higher cost water that was necessarily consumed in Tier 1.

pumping and storage costs and determined that some of those costs did not vary with the level of water usage. Those costs were allocated to all Tiers. [The City] also considered the incremental costs of pumping and storage that are linked to peak demand on water supply, or water usage that exceed the water budget allocation. [The City] then allocated those peak pumping and storage charges to Tiers 3 and 4. In that way, [the City] allocated the incremental costs of pumping and storage caused by the greater water demand to customers in those tiers that created the demand." We disagree with the Drehers' position, finding substantial evidence in the administrative record supporting these factual findings.

The City's COSS and rate study show that the City determined the marginal cost of each element of pumping and storage (e.g., distribution storage plant, operations and maintenance of storage facilities, pumping operations and maintenance, and pumping plant investment). The Drehers do not reference the underlying data or challenge the City's methodology for calculating these marginal costs per HCF of water.

The Drehers challenge the trial court's finding that the City determined PP&S costs are caused by water usage above the Tier 2 level. Substantial evidence in the administrative record supports this finding. With respect to storage plant capital costs, for example, the record shows that half of the water the City stores is used to meet base demand (Tiers 1 and 2), and the other half is used to meet peak demand (Tiers 3 and 4). Therefore, the City allocates 50 percent of the marginal storage plant capital costs to base costs that are applied to Tiers 1-4, and 50 percent of the marginal costs to PP&S costs that are applied to Tiers 3 and

80

4. The Drehers do not challenge the City's decision to store water at a certain capacity to ensure that its customers' needs are met at any given time.

Nor do the Drehers challenge the application of each individual element of marginal PP&S costs to Tiers 3 and 4. Instead, they challenge the PP&S costs globally, arguing that "there is no evidence in the record the water used during times of peak demand is used only in Tiers 3 and 4, and not in Tiers 1 and 2, or that the users who get into the higher volume use at any time would cause the City to have to oversize its system." (Bold font omitted.) However, the City did not allocate PP&S costs based on specific time-of-use factors. Rather, the City allocated PP&S costs based on its determinations as to the overall pumping and storage *capacity* it needs in order to deliver water at the levels of usage defined in Tiers 3 and 4. The Drehers do not explain why these determinations by the City do not constitute "evidence." We conclude that they do.

It is "for the trial court to decide in the first instance" if the agency "substantiate[d] [its] analysis with data that meaningfully captured the cost of service to the parcel." (*Coziahr*, *supra*, 103 Cal.App.5th at p. 803.) We review the trial court's findings for substantial evidence, accepting the inferences the trial court drew from the evidence, if reasonable. (*Patz*, *supra*, 113 Cal.App.5th at p. 271.) Under these standards, we have no cause to disturb the trial court's findings related to the City's allocation of PP&S costs to Tiers 3 and 4. "Proposition 218 protects lower-than-average users from having to pay rates that are higher than the cost of service for them because those rates cover capital investments their levels of consumption do not make necessary." (*Capistrano*, *supra*, 235 Cal.App.4th at p. 1503.)

81

For the foregoing reasons, the trial court did not err in concluding the City's tiered water rates (minus the LISA) comply with section 6(b)(3). There is substantial evidence in the administrative record, withstanding our independent review, establishing that the City met its burden at trial of demonstrating its water rates do not exceed the proportional cost of the service attributable to the parcel.

## C. The Drehers Have Not Shown They Were Prejudiced by the Trial Court's Denial of Their Motion to Allow Expert Testimony at Trial

The Drehers also briefly argue the trial court erred in denying their motion to allow expert testimony at trial. They focus on whether extra-record evidence is allowed in writ proceedings challenging charges under Proposition 218, and not at all on what expert evidence might show in this case. We may not reverse a judgment for erroneous exclusion of evidence unless the error resulted in a miscarriage of justice. (Art. VI, § 13; Evid. Code, § 354.) We need not decide if the trial court erred because even assuming error, we would not reverse the judgment because the record does not show a miscarriage of justice.

In *Malott*, *supra*, 55 Cal.App.5th at page 1107, the case on which the Drehers rely in support of their claim of error, the plaintiff submitted a declaration from an expert, and the trial court excluded it on the ground it had not been presented at the public hearing on a wastewater rate increase. In deciding whether the trial court erred, the Court of Appeal first determined that extra-record expert evidence was permissible in the action challenging the rate increase under Proposition 218. (*Id*. at pp. 1106-1111.) Next, the court reviewed the substance of

82

the declaration and determined (1) that it was relevant to the plaintiff's section 6(b)(3) challenge to the sanitary district's method of calculating rates, and (2) a trier of fact accepting the expert's opinions could find the district did not comply with section 6(b)(3). (*Id*. at pp. 1106, 1111-1112.) Therefore, the appellate court reversed the judgment in favor of the district and remanded the matter for further proceedings. (*Id*. at pp. 1105, 1112.)

The Drehers told the trial court they wanted an expert to analyze the administrative record. In their appellate briefing, they provide no additional information. Based on our review of the administrative record, we concluded the City met its burden at trial of proving compliance with section 6(b)(3). The Drehers have not explained what portions of the administrative record call for expert analysis and what such analysis might show. We will not reverse the judgment based on nothing more than speculation that the Drehers might find an expert who might say something helpful about their case. There is no showing that the denial of the motion to allow expert evidence at trial resulted in a miscarriage of justice.

## DISPOSITION

The judgment is affirmed.  Respondent is entitled to recover costs on appeal.

CERTIFIED FOR PUBLICATION


M. KIM, J.

We concur:


WEINGART, Acting P. J.


ADAMS, J.*

---

* Associate Justice of the Court of Appeal, Second Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.